RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0058p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MICHAEL FISHER,

               *Plaintiff-Appellant*,

    *v.*

NISSAN NORTH AMERICA, INC.,

               *Defendant-Appellee*.

> No. 18-5847

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:17-cv-00814—William Lynn Campbell, Jr., District Judge.

Argued: May 9, 2019

Decided and Filed: February 27, 2020

Before: BOGGS, BATCHELDER, and STRANCH, Circuit Judges.

---

## COUNSEL

**ARGUED:** Constance Mann, THE LAW OFFICES OF CONSTANCE MANN, Franklin, Tennessee, for Appellant. Stanley E. Graham, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee. **ON BRIEF:** Constance Mann, THE LAW OFFICES OF CONSTANCE MANN, Franklin, Tennessee, for Appellant. Stanley E. Graham, Brittany Stancombe Hopper, WALLER LANSDEN DORTCH & DAVIS, LLP, Nashville, Tennessee, for Appellee.

---

## OPINION

---

JANE B. STRANCH, Circuit Judge. Plaintiff Michael Fisher began working on Defendant Nissan North America's factory floor in 2003. Approximately 12 years later, Fisher

went on extended leave for severe kidney disease and, ultimately, a kidney transplant.  When he returned to work, he was still recovering from the transplant, and his attendance suffered.  Fisher proposed several different accommodations, some of which were not provided.  When he received a final written warning about his attendance, he left work and did not return.  Fisher filed suit, centrally claiming that Nissan failed to accommodate his disability and to engage in the interactive process, as required by the Americans with Disabilities Act (ADA or the Act), 42 U.S.C. § 12101 *et seq*.  The district court granted summary judgment to Nissan.  Because material factual disputes remain on some of Fisher's claims, we **AFFIRM** in part and **REVERSE** in part.

## I.  BACKGROUND

In January 2003, Nissan hired Fisher as a production technician on its factory line.  He primarily worked in the Fits rotation, attaching doors, hoods, and trunks to new vehicles.

Fisher consistently received positive performance evaluations.  At his ten-year evaluation, for example, he met requirements in 16 categories and exceeded requirements in the remaining 6.  His supervisor complimented his "great attitude," writing that he would like to make Fisher "a key trainer because it seems you do very well at teaching and showing others how to do the job the right way."  Fisher had few disciplinary problems.  He estimated that he might have been "written up" two or three times during his 14 years at the plant, though there are no written warnings in the record.  He did receive occasional "counseling"—the disciplinary step before a verbal warning—and one verbal warning for calling in sick without enough leave time to cover his absence.  But in 2013, his supervisor noted that Fisher had "been doing better the[] last couple months" with regard to attendance and told him to "keep up the good work."

Then, Fisher's kidney problems worsened.  In 2015, he discussed his illness with the Fits supervisor, explaining that his kidney function, which had been low for years, had dropped more.  Hoping to continue working, Fisher asked his supervisor for a transfer to an easier position.  The supervisor responded, "I could put you somewhere, but it ain't for this kind of stuff.  You just need to go on, go on out."  So, Fisher went on extended leave, drawing long-term disability payments.

In August 2016, Fisher received a kidney transplant. For months after the surgery, he remained easily fatigued. The antirejection medicines caused serious side effects that Fisher described as "almost like having the flu every day." If he exerted himself to the point of sweating, his kidney function decreased and the symptoms worsened. His doctor estimated that it would take a year to become accustomed to the medicines.

But by October, Fisher's leave was running out, and his disability payments were ending. Nissan's human-resources manager warned Fisher that if he was not able to extend his leave, he could lose his job; she also said he could not return to work with restrictions When Fisher raised this situation with his doctor, she cleared him to return to work on October 17, 2016.

When Fisher returned to work, he was placed in what everyone hoped would be an easier position, building doors in the Closures rotation. Fisher acknowledged that the move was well intentioned, but when he began the work, he found that it was "10 times harder" than Fits. He requested extra breaks or to work half-time and was refused. When he asked for a transfer to a different position, his supervisor's response was equivocal: "yes, maybe, you know, we'll see."

Around the same time, on October 20, Fisher's doctor wrote Nissan a letter explaining that Fisher was "risk[ing] his health" and that, "ideally," Fisher needed "at least another month [off work] to build up his strength." She also wrote that he "would benefit from being transitioned into his job gradually, perhaps working half-time for a few weeks before doing full-time work." Before a decision was reached on Fisher's pending transfer request, the human-resources manager informed Fisher that he had been granted extra leave.

A few weeks later, Fisher's doctor wrote another letter, this time certifying that Fisher was "medically cleared to return to work" but needed bathroom breaks to prevent damage to the transplanted kidney. In late November—a month before his extended leave ran out—Fisher returned to work a second time, this time (per his request) back at his old position in Fits.

The work was challenging. Fisher had not acclimated to his antirejection medicines, and his flu-like symptoms continued. He also needed time off for doctor's appointments but had no leave time left. He began to miss work more frequently—and to be disciplined for his absences. First, he got a verbal warning for going home early on December 21 and January 4 and calling in

sick on January 11.  A week later, he received a written warning for leaving early on January 19 and calling in sick on January 25.  And finally, on February 3, he was issued a final written reminder for leaving early on January 27 and being late on January 31.  According to Fisher, all these absences were related to his kidney.

As each warning was issued, Fisher met with supervisors and human resources to discuss his attendance.  Fisher testified that he always described his kidney transplant and requested potential accommodations.  For example, after being warned about missing work for a doctor's appointment in December, Fisher asked his supervisor "again" if there was an easier position, such as checking bolts or working in final fit.  The supervisor responded, "I feel for you, but my hands are tied."  Fisher suggested working half days but "Nissan had already talked to [his] doctor about that and said no, that's not an option."  And Nissan made "such a big deal about" Fisher's requests for extra breaks that he eventually "left it alone."

When describing his final meeting with human resources on February 3, Fisher explained that he was pessimistic because he had "asked them before" for help.  He nonetheless attempted again to describe his illness and his doctor's suggestions for his return to work.  One human-resources representative said Nissan needed restrictions, not suggestions, and Fisher responded that he had not been permitted to return to work with restrictions.  The representative "went ballistic" and said that Fisher could not "just be going home for a stomachache."  According to Nissan's notes from the meeting, Fisher said that the company was "not willing to work with [him]" and requested "another job."  Human resources asked, "If you cannot come to work, what will moving you to another job accomplish?"  Fisher responded, "Let's do it and we'll see." Without further discussion of the possibility of a transfer, Nissan's representatives issued the final warning.

At the end of the meeting, a representative told Fisher that he had "never seen anybody come back" from a final written warning.  So, Fisher left the plant without informing his supervisors and did not return.  A week later, he was terminated for absenteeism.

Fisher then filed suit against Nissan, bringing disability-related claims under the ADA and its state equivalent, the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, as well as a

tort claim for intentional infliction of emotional distress.  The district court granted summary judgment to Nissan on all claims, and Fisher appealed.

## II.  ANALYSIS

### A.  Failure to Accommodate

Fisher's central claims against Nissan arise under the ADA.  The ADA was enacted in response to congressional findings highlighting "the continuing existence of unfair and unnecessary discrimination and prejudice [that] denies people with disabilities the opportunity to compete on an equal basis."  42 U.S.C. § 12101(a)(8).  When the Act was amended in 2008, "Congress reasserted its goal of 'provid[ing] clear, strong, consistent, enforceable standards' to implement a 'comprehensive national mandate for the elimination of discrimination against individuals with disabilities.'"  *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 849 (6th Cir. 2018) (alteration in original) (quoting 42 U.S.C. § 12101(b)(1), (2)).

To that end, the ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability."  42 U.S.C. § 12112(a).  The Act's broad definition of discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  *Id.* § 12112(b)(5)(A); *see also Kleiber v. Honda of Am. Mfg.*, 485 F.3d 862, 868 (6th Cir. 2007).

Fisher claims that Nissan discriminated against him by failing to accommodate his disability.  The district court granted summary judgment to Nissan on this claim.  We review a district court's grant of summary judgment de novo, viewing all the evidence in the light most favorable to the nonmoving party and drawing "all justifiable inferences" in his favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The central question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.

1. <u>Direct or Indirect Evidence</u>

The parties dispute which test applies to Fisher's failure to accommodate claim. ADA discrimination claims are analyzed under two different rubrics, depending on whether the plaintiff relies on "direct" or "indirect" evidence of discrimination. *See Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891–92 (6th Cir. 2016). Direct evidence of disability discrimination "does not require the fact finder to draw any inferences [to conclude] that the disability was at least a motivating factor." *Hostettler*, 895 F.3d at 853 (citation and internal quotation marks omitted). We have explained why the distinction between direct and indirect is "vital":

> When an employer acknowledges that it relied upon the plaintiff's handicap in making its employment decision[,] the *McDonnell Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant and the plaintiff has direct evidence of discrimination on the basis of his or her disability.

*Ferrari*, 862 F.3d at 892 (alterations, citation, and internal quotation marks omitted).

Because failure to accommodate is listed in the Act's definition of disability discrimination, *see* 42 U.S.C. § 12112(b)(5)(A), "claims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence (the failure to accommodate) of discrimination. . . . [I]f the fact-finder accepts the employee's version of the facts, no inference is necessary to conclude that the employee has proven this form of discrimination." *Kleiber*, 485 F.3d at 868 (citation omitted). A substantial body of our caselaw confirms this distinction. *See, e.g.*, *Brumley v. UPS*, 909 F.3d 834, 839 (6th Cir. 2018); *EEOC v. Dolgencorp, LLC*, 899 F.3d 428, 435 (6th Cir. 2018); *Hostettler*, 895 F.3d at 853; *Meade v. AT&T Corp.*, 657 F. App'x 391, 395–96 (6th Cir. 2016); *Belasco v. Warrensville Heights City Sch. Dist.*, 634 F. App'x 507, 514 (6th Cir. 2015); *Banks v. Bosch Rexroth Corp.*, 610 F. App'x 519, 526 (6th Cir. 2015); *Horn v. Knight Facilities Mgmt.-GM*, 556 F. App'x 452, 454–55 (6th Cir. 2014); *Cash v. Siegel-Robert, Inc.*, 548 F. App'x 330, 334 (6th Cir. 2013).

Despite this robust precedent, Nissan argues that "a *per se* rule applying the direct evidence test to all accommodation cases would conflict with the numerous published and unpublished decisions of the Sixth Circuit." As Nissan points out, we have occasionally—

though generally in unpublished cases—analyzed a failure-to-accommodate claim under the indirect test. *See, e.g.*, *Keogh v. Concentra Health Servs.*, 752 F. App'x 316, 326 (6th Cir. 2018); *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 603 (6th Cir. 2018); *Aldini v. Kroger Co. of Mich.*, 628 F. App'x 347, 350 (6th Cir. 2015); *Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982–83 (6th Cir. 2011). These cases do not explain why they apply the indirect test rather than the direct, nor do they distinguish *Kleiber* and its progeny. And each can be traced back to a single case, *DiCarlo v. Potter*, that applied the indirect test when analyzing a failure to accommodate claim under the Rehabilitation Act, not the ADA. 358 F.3d 408, 419 (6th Cir. 2004).[1] Our court, sitting en banc, has explained that though the two statutes have many similarities, they are not identical. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 314–17 (6th Cir. 2012) (en banc). *Kleiber*, our foundational case establishing that ADA failure to accommodate claims are analyzed pursuant to the direct test, controls.

Fisher also provides additional direct evidence of discrimination, in the form of an alleged policy against accommodating "personal" disabilities. According to both Fisher's testimony and notes from a nurse at his doctor's office, Nissan refused to allow him to return to work with restrictions. When Fisher requested transfers to easier positions, one supervisor insisted that easier positions "ain't for this kind of stuff" and another said his "hands [were] tied." Yet Fisher claimed to have heard of at least two coworkers who were permitted restrictions and reassignments to easier positions after suffering on-the-job injuries. One of his supervisors explained the difference in a memo, writing that "Nissan does not accommodate personal restrictions." In records from Fisher's visits to Nissan's medical department, the diagnosis reads only "[p]ersonal." Factual disputes as to Nissan's policies regarding assignment to easier positions remain.

Because the record reflects that Fisher's claim was based on Nissan's failure to offer a reasonable accommodation, it involves direct evidence of discrimination under the ADA. *See Hostettler*, 895 F.3d at 853. Under the direct-evidence framework, Fisher bears the burden of

---

[1]Tracing the citation chain back further, *DiCarlo* relies on another Rehabilitation Act case, *Gaines v. Runyon*, 107 F.3d 1171, 1175–76 (6th Cir. 1997), for the indirect test.

establishing (1) that he is disabled, and (2) that he is "'otherwise qualified' for the position despite his or her disability: (a) without accommodation from the employer; (b) with an alleged 'essential' job requirement eliminated; or (c) with a proposed reasonable accommodation." *Kleiber*, 485 F.3d at 869 (quoting *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 452 (6th Cir. 2004)). Nissan bears the burden of "proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon" Nissan. *Id.* (citation omitted). Notably, although "[a] defendant may use a legitimate, nondiscriminatory rationale as a shield against indirect or circumstantial evidence of discrimination," such a "neutral policy is of no moment" under the direct test. *Dolgencorp*, 899 F.3d at 435 (emphasis omitted). In other words, an employer "may not illegitimately deny an employee a reasonable accommodation" pursuant to "a general policy and use that same policy as a" so-called "neutral basis for firing him." *Id.*

Because Nissan does not dispute that Fisher is disabled, we proceed to the second element of Fisher's proof.

### 2. Otherwise Qualified

When Fisher returned to work in late November 2016, he left early or called out sick without leave time to cover his absences because he "was still healing and still getting used to the [antirejection] medicine." Nissan argues that these absences render Fisher unqualified for his position.

But this logic does not apply if the absenteeism is caused by an underlying failure to accommodate a disability. "Imagine," we have instructed, "a school that lacked an elevator to accommodate a teacher with mobility problems. It could not refuse to assign him to classrooms on the first floor, then turn around and fire him for being late to class after he took too long to climb the stairs between periods." *Dolgencorp*, 899 F.3d at 435. In other words, even though presence in the classroom when the bell rings is an attendance requirement, a tardy teacher is not unqualified if his tardiness results from his employer's unwillingness to accommodate. If, by contrast, no reasonable accommodation would cure the attendance problem—as, for example, when an employee is not medically cleared to work at all, *see Gantt v. Wilson Sporting Goods*

*Co.*, 143 F.3d 1042, 1047 (6th Cir. 1998), or blames his absences on car problems rather than disability, *see Stanciel v. Donahoe*, 570 F. App'x 578, 580 (6th Cir. 2014)—the employee is not qualified. *See also Williams v. AT&T Mobility Services LLC*, 847 F.3d 384, 394 (6th Cir. 2017) (rejecting a failure to accommodate claim in part because "Williams provided no explanation for how Thompson's specific recommendation of ten-minute breaks every two hours would alleviate" anxiety attacks that could happen at any time). "Hence 'failure to consider the possibility of reasonable accommodation for known disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities.'" *Dolgencorp*, 899 F.3d at 435 (quoting *McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 460 (6th Cir. 1997) (en banc)).

*Brenneman v. MedCentral Health System*, 366 F.3d 412 (6th Cir. 2004), exemplifies this distinction. There, as here, the employer argued that the plaintiff was not qualified "due to his excessive absenteeism." *Id.* at 419. The plaintiff in *Brenneman* "had been absent 193 times and had arrived late or left early on 34 occasions within the five years preceding his termination," even though "regular attendance" was an essential function of the position. *Id.* at 419–20. In analyzing this argument, we began from the proposition that "*even if* defendant had granted plaintiff medical leave for those absences which plaintiff specifically alleges were [disability]-related," the plaintiff "would not have been qualified" for his position. *Id.* at 418–19 (emphasis added). Under *Brenneman*'s logic, absenteeism that is unrelated to disability may indeed render a plaintiff unqualified. For purposes of the "otherwise qualified" analysis, absenteeism that can be cured with a reasonable accommodation is treated differently.

Fisher stated on the record that all the absences were "because of [his] kidney." In its briefing, Nissan does not dispute this point.**[2]** Thus, Fisher's absences do not in and of themselves render him unqualified for his position. Instead, under *Dolgencorp*, we ask whether those absences could have been avoided with reasonable accommodation—or, as in *Brenneman*, whether no reasonable accommodation would cure them.

---

**[2]**At oral argument, Nissan argued for the first time that some of Fisher's absences were unrelated to his disability. *See* Oral Argument at 23:28–24:12, *Fisher v. Nissan N. Am.*, No. 18-5847 (6th Cir. May 9, 2019). This argument is forfeited. *See Conlin v. Mortg. Elec. Registration Sys.*, 714 F.3d 355, 360 n.5 (6th Cir. 2013). Even if we were to consider the argument, it would simply create a factual dispute.

3.  The Proposed Accommodations

The ADA requires employers to "mak[e] reasonable accommodations."  42 U.S.C. § 12112(b)(5)(A); *see also Kleiber*, 485 F.3d at 868.  The plaintiff bears the initial burden of showing "that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002).  The defendant then must show either "special (typically case-specific) circumstances that demonstrate undue hardship in the particular circumstances," *id.* at 402, or that the proposed accommodation eliminates an essential job requirement, *Kleiber*, 485 F.3d at 869.  The reasonableness of a proposed accommodation is a question of fact. *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir. 1998).

In his briefing, Fisher identifies three potential accommodations that could have aided his transition back to full-time employment:  a transfer to a different position, extra breaks, or a temporary part-time schedule.  If one of these three accommodations passes muster, summary judgment in Nissan's favor is not appropriate.

We begin with Fisher's transfer requests.  The Act defines reasonable accommodation to include "reassignment to a vacant position."  42 U.S.C. § 12111(9)(B).  To show disability discrimination in the reassignment context, a plaintiff must show either that "he requested, and was denied, reassignment to a position for which he was otherwise qualified" or that "he requested and was denied some specific assistance in identifying jobs for which he could qualify." *Burns v. Coca-Cola Enterprises Inc.*, 222 F.3d 247, 258 (6th Cir. 2000).  If an employee requests assistance in identifying vacant positions—even a request as generic as "I want to keep working for you—do you have any suggestions?"—then "the employer has a duty under the ADA to ascertain whether he has some job that the employee might be able to fill." *Id.* at 257 (brackets omitted) (quoting *Miller v. Ill. Dep't of Corrections*, 107 F.3d 483, 487 (7th Cir. 1997)).  The employee is not required to use magic words such as "accommodation" and "disability"; rather, we ask whether "a factfinder could infer that [the interaction] constituted a request for an accommodation." *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004).  Then, "to overcome summary judgment, the plaintiff generally must identify the specific job he seeks and demonstrate that he is qualified for that position." *Kleiber*, 485 F.3d at 870.

Fisher testified that in his "various meetings" with human resources, he always discussed his kidney failure and his need for accommodation. Fisher states that though he did not understand the ADA framework, he knew he "had some kind of right to either, you know, try to hold onto my job, you know, maybe get a little bit of assistance, help somehow, somewhere, something," but that Nissan provided neither assistance nor explanation. The one meeting for which the record contains contemporaneous notes confirms this. When the human-resources representative asked Fisher if there was "something we can do," Fisher said (among other requests), "Give me another job." Nissan responded, "If you cannot come to work, what will moving you to another job accomplish?", and then informed him of the disciplinary decision.

Fisher testified that he had a friend who was injured while working at Nissan and was placed in an inspection position, checking bolts and hoods. Fisher repeatedly requested a similar move, as is shown by one interaction between Fisher and his supervisor after Fisher's second return to work:

> I had a doctor's appointment, I think it was in December, and . . . when I came back and they told me that I was—[my supervisor,] Chris [Hargrove,] told me that I was going to be wrote up for that, for missing that—for missing that day that I went to the doctor's. I had *asked him again*, I mean, *there has got to be something easier here*. I have seen you—I have been here for 14 years. I know— you know, *I could check bolts on the cars, I could check—I can go to final fit, work final fit*. I mean, *you have moved people all over the plant before I know . . .*
>
> And [Hargrove]—he said, "I feel for you, but my hands are tied. You know, there is pretty much nothing I can do."

A reasonable factfinder could conclude that these interactions constituted a request for accommodation, including both for specific transfers (to a bolt-checking position or to final fit) and for "assistance in identifying jobs for which [Fisher] could qualify." *Burns*, 222 F.3d at 258; *see also Smith*, 376 F.3d at 535.

Nissan was therefore obliged to take three steps: (1) "identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites"; (2) "determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or

without reasonable accommodations"; and (3) "consider transferring the employee to any of these other jobs, including those that would represent a demotion." *Burns*, 222 F.3d at 257 (quoting *Dalton v. Subaru-Isuzu Auto., Inc.*, 141 F.3d 667, 678 (7th Cir. 1998)).  For example, in *Burns* itself, the employee was not qualified for the clerical position he requested, so the employer invited him to interview for a sales position.  *Id.* at 251.  There is no evidence in the record of comparable attempts by Nissan to identify suitable alternative positions for Fisher.

Nissan now submits that there was no suitable position.  In particular, Nissan focuses on one of Fisher's requests, to be a so-called "offline" worker.  Offline workers substitute for employees who need to step away from the production line for any reason, such as for a bathroom break.  But Fisher conceded during his deposition both that "there was no opening" for an offline position and that he had been denied such a position "years ago" because he lacked seniority.  Either admission suffices to deem that request unreasonable.  First, if there was no opening, the position was not "vacant," as required by 42 U.S.C. § 12111(9)(B).  *C.f. Rorrer v. City of Stow*, 743 F.3d 1025, 1044 (6th Cir. 2014); *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000).  And second, it is not "reasonable in the run of cases" for a disability-related request for accommodation to "trump the rules of a seniority system."  *U.S. Airways*, 535 U.S. at 403.  Fisher has not shown any "special circumstances" (such as the employer's failure to abide by its seniority system), *see id.* at 405, that could overcome that general proposition.

But in his request for accommodation, Fisher identified other positions, such as checking bolts or moving to final fit.  Seniority rules did not bar such a transfer; Fisher knew of an employee junior to him who checked bolts and hoods.  Like that junior employee, Fisher indicated that he was qualified to inspect vehicles, a position apparently less challenging than the jobs he had worked for more than a decade.  And Fisher insisted that he could have been placed in a position checking bolts when he requested the move.  The record contains no evidence to the contrary, much less any evidence showing that final fit was full or that all other inspection

positions were occupied.  A factfinder could therefore credit Fisher's statement that there were vacant positions.**3**

Nissan is then afforded an opportunity to show that Fisher's transfer request would create an undue hardship or remove an essential function of the job.  *See Kleiber*, 485 F.3d at 869.  Nissan does not do so, instead pointing out that Fisher's earlier transfers to Closures and back to Fits proved unsuccessful.  This attempt to accommodate Fisher is to Nissan's credit but has no bearing on whether a subsequent transfer request was unreasonable.  The burden is on Nissan to present fact-specific evidence of hardship, and it has not done so.

Because a factfinder could conclude both that Fisher was qualified for a vacant inspection position he identified and that he requested and was denied assistance in identifying other available positions, Nissan is not entitled to summary judgment on the failure to accommodate claim.  We therefore need not consider whether Fisher's other proposed accommodations might also have been reasonable.

**B.  Failure to Engage in the Interactive Process**

Next, Fisher alleges that Nissan failed to engage in the ADA's mandatory interactive process of determining how best to accommodate his disability.

"Once an employee requests an accommodation, the employer has a duty to engage in an interactive process."  *Hostettler*, 895 F.3d at 857.  From that point, "both parties have a duty to participate in good faith."  *Kleiber*, 485 F.3d at 871.  Once the employee "establishes a prima facie showing that he proposed a reasonable accommodation," *Rorrer*, 743 F.3d at 1041, "the employer has the burden of showing how the accommodation would cause an undue hardship," *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202–03 (6th Cir. 2010).  If the interactive process was triggered but not successfully resolved, "courts should attempt to isolate the cause of the breakdown and then assign responsibility."  *Kleiber*, 485 F.3d at 871 (quoting *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)).  For example, though an

---

**3**Fisher requests that we take judicial notice of additional evidence of vacancies at that factory.  Having already concluded that whether a vacancy existed is a disputed and material fact, it is unnecessary for this court to resolve Fisher's motion for judicial notice.

employer is not required to propose counter accommodations, such a proposal may be "evidence of good faith." *Jakubowski*, 627 F.3d 203. On the other hand, an employer who "determine[s] what accommodation it [is] willing to offer before ever speaking with" the employee does not participate in good faith. *Mosby-Meachem*, 883 F.3d at 606.

When Fisher first returned to work after his surgery, in October 2016, Nissan took steps to facilitate his transition. First, Nissan transferred him to Closures, hoping the position would be easier than his work in Fits. This transfer to a vacant position (as well as the subsequent transfer back to his old position when Closures proved more strenuous than Fits) was an attempt at accommodating Fisher's disability and evidences good-faith participation in the interactive process as of October 2016. When Fisher's doctor requested he be given more time off work, his leave was extended—a second attempt at accommodation. Thus, as of Fisher's return to Fits in November 2016, Nissan was participating in the interactive process in good faith.

In late December of that year and January of the next, Fisher's repeated absences demonstrated that he was still struggling with his kidney transplant. As discussed above, Fisher proposed at least one reasonable accommodation in that period: a transfer to an inspection position. A factfinder could also conclude that he requested assistance in identifying other vacant positions.

Those suggestions implicated Nissan's continuing mandatory duty of good-faith participation in the interactive process. *See Rorrer*, 743 F.3d at 1041. At a minimum, Nissan was then required to "show[] how the accommodation would cause an undue hardship," *Jakubowski*, 627 F.3d at 202–03, or "that a challenged job criterion is essential," *Hedrick*, 355 F.3d at 452. As discussed above, Nissan has not carried this burden. Nor is there any evidence that, from late December through early February, as Fisher's need for accommodation became even more apparent, Nissan took any steps that evidenced good-faith participation in the interactive process, such as proposing counter accommodations. *See id.* at 203. Because a

factfinder could conclude that Nissan bears the responsibility for its failure to respond to Fisher's renewed requests for accommodation, Nissan is not entitled to summary judgment.**4**

### C. Discovery Dispute

Fisher also argues that the district court abused its discretion in denying his motion to reopen discovery while, in a different employment suit involving different parties, allowing reopening of discovery where it benefited the employer. *See* Order, *Bolden v. Lowe's Home Ctrs., LLC*, No. 3:17-CV-741 (M.D. Tenn. June 20, 2018) (D.E. 45).

Decisions regarding discovery are reviewed under the deferential abuse of discretion standard and reversed only if "the reviewing court is left with 'a definite and firm conviction that the court below committed a clear error of judgment.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642 (6th Cir. 2018) (quoting *Interactive Prods. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 700 (6th Cir. 2003)). In reviewing a denial of additional discovery time, we consider factors including "when the moving party learned of the issue that is the subject of discovery, how the discovery would affect the ruling below, the length of the discovery period, whether the moving party was dilatory, and whether the adverse party was responsive to prior discovery requests." *Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006).

The district court's rejection of Fisher's motion rested primarily on the first factor. As the court explained, Fisher's request to subpoena a hiring agency did not warrant an extension because "Plaintiff's counsel was aware of the involvement of [the agency] prior to [Fisher's] deposition being taken." Fisher does not dispute that reasoning on appeal, though he does reference Nissan's delay in completing Fisher's deposition. Such delay might favor deadline extension if the deposition raised new issues. But Fisher knew both the identity of the agency and the relevance of vacancies prior to his own deposition. We affirm the district court's refusal to reopen discovery.

---

**4**The district court also analyzed and dismissed claims of harassment and discriminatory discharge under the ADA. Fisher does not mention those claims on appeal. Fisher likewise asserted a claim under the Tennessee Disability Act in his complaint but does not mention that statute or cite any cases interpreting it in his briefs before us. Because Fisher does not pursue these claims on appeal, he has forfeited any challenge to their dismissal. *See Conlin*, 714 F.3d at 360 n.5.

**D. Intentional Infliction of Emotional Distress**

Finally, Fisher argues that the district court improperly granted summary judgment to Nissan on his tort claim for intentional infliction of emotional distress.

The parties agree that this claim is analyzed under Tennessee law. In Tennessee, "[t]he elements of an intentional infliction of emotional distress claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012).

Tennessee courts have cautioned that discrimination "does not automatically give rise to the imposition of liability for intentional infliction of emotional distress." *Arnett v. Domino's Pizza I, LLC*, 124 S.W.3d 529, 540 (Tenn. Ct. App. 2003). As the Tennessee appellate court recognized in a race discrimination claim, discriminatory behavior is "insulting and humiliating" and "at the very core of the federal Civil Rights Acts and the Tennessee Human Rights Act." *Id.* The court was concerned, however, that if the two were coterminous, then "virtually every action brought under these [anti-discrimination] statutes would include an intentional infliction of emotional distress claim." *Id.* This logic applies here. *See Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1111 (6th Cir. 2008) (explaining that, under Ohio law, "an employee's termination, even if based upon discrimination, does not rise to the level of extreme and outrageous conduct without proof of something more" (citation and internal quotation marks omitted)).

As a component of such claim, Fisher would have to show serious mental injury. On this point, Fisher points to his testimony that Nissan's behavior upset him so much that he called his wife in tears. But in *Rogers*, the Tennessee Supreme Court held that the mental injury element was not satisfied when a mother tending her son's neglected grave introduced evidence that she was "emotional," "tearful," and honestly upset by the conditions of the cemetery. *Rogers*, 367 S.W.3d at 211. Fisher's claim likewise fails because he has not demonstrated that he "suffered physiological or psychological symptoms, sought medical or professional treatment, or

incurred any significant impairment in [his] daily functioning resulting from [Nissan's] conduct." *Id.*

We therefore affirm the district court's decision granting summary judgment to Nissan on the claim of intentional infliction of emotional distress.

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the grant of summary judgment on Fisher's ADA claims for failure to accommodate and failure to engage in the interactive process, **AFFIRM** the refusal to extend discovery and the grant of summary judgment on the claim for intentional infliction of emotional distress, and **REMAND** for further proceedings consistent with this opinion.