NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0375n.06

Case No. 23-3404

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| TINA ROOT, | ) | **FILED** |
|   Plaintiff-Appellant, | ) | Sep 03, 2024 |
|  | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| DECORATIVE PAINT, INC., | ) |  |
|   Defendant-Appellee. | ) |  |
|  | ) | O P I N I O N |

Before: BATCHELDER, CLAY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. Tina Root lost her job as a production associate for Decorative Paint, Inc. ("DPI") after she presented a letter from her doctor indicating that she should not work around paint fumes. She subsequently filed suit against DPI, claiming disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, the Ohio Revised Code Ann. § 4112.02, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*. Root claimed her chronic obstructive pulmonary disease ("COPD") and asthma made it hard for her to breathe in the area of the plant where she had only recently been assigned. She alleged that DPI denied her accommodation request to be moved to a position with limited exposure to paint fumes and fired her because of her disability. On cross-motions for summary judgment, the district court denied Root's motion for partial summary judgment and granted DPI's motion on all claims. On appeal, Root asks us to reverse the district court's ruling as to her state and federal

failure to accommodate and discriminatory discharge claims and to remand the case for a jury trial. Root does not appeal the district court's grant of summary judgment in DPI's favor on her FMLA claim. Because there remain genuine issues of material fact on both Root's accommodation and discharge claims, we reverse and remand the case to the district court.

## I.

### A.

*Factual Background.* Root has suffered from symptoms of COPD and asthma since as early as 2016. For over three years, these conditions did not prevent her from working as a production associate assigned to the "Rework" department at DPI, a small Ohio plant specializing in painting and injection molding automotive parts. Production associates assigned to Rework were required to "re-work" parts that had imperfections. This process primarily involved removing blemished parts from the production line and sanding them down to prepare them to be repainted. Like other skilled jobs at the plant, Rework tasks had to be performed by qualified and proficient employees. Every production associate in the plant was assigned to a specific job on the production line and would only be transferred to do a different job on the line if qualified to do the work. Root possessed multiple qualifications and occasionally filled in as needed to perform work in other areas of the plant. These other areas were categorized alphabetically based on their position on the manufacturing line. When Root filled in for other positions—usually on the A-line or the D-line—it was normally for no more than a couple of hours at a time.

*FMLA Leave and COVID-19.* In February 2020, Root took FMLA leave to undergo a medical procedure about one month before the COVID-19 pandemic struck. During Root's leave, DPI laid off a large portion of its workforce due to the pandemic. Though Root was medically cleared to return to DPI on May 9, 2020, she was unable to immediately resume working because

DPI had not fully reinstated its employees. Meanwhile, due to its low personnel numbers, DPI required returning employees to perform a range of duties beyond their usual assignments. This frequently required employees to move between stations or lines as needed. However, DPI's workforce changes did not seem to affect the Rework department in the same way. With the exception of Root, the same six individuals who were assigned to Rework pre-COVID continued to primarily work there during and after the COVID layoff. As was the case before the layoff, Rework production associates continued to occasionally assist in other areas when needed.

*Return to DPI and D-Line.* As COVID era restrictions eased, Human Resources ("HR") Director Sara Fuller began calling people back to DPI's active workforce. When Fuller called Root back to work, she advised her of the personnel shortage and assigned her to work on the "D-line." Root was assigned the section of the D-line closest to the painting oven and its fumes. After working one 10-hour shift on the D-line, Root began experiencing shortness of breath and difficulties breathing. That same afternoon, Root attended a telehealth visit with Dr. Kimberly Hagerman during which she described the problems she was having with her breathing in her new D-line position. Root told Dr. Hagerman that "she just wanted to go back to her old department [in Rework] so she didn't have that exposure [to paint fumes]." (R. 25, Dr. Hagerman Dep. Tr., PageID 1116). Dr. Hagerman issued the following note after meeting with Root:

> This will certify that TINA ROOT has been under my care and seen in my office on 07/21/2020. Tina Root has a[n] underlying health condition – COPD & ASTHMA that makes it hard to breath (sic) when around paint fumes and should not be working around it. Please feel free to call our office with any questions or concerns.

(R. 19-16, Dr. Hagerman Note, PageID 489).

Root presented the medical note to Christopher Ankney, a production supervisor for the D-line. Root explained to Ankney that working on the D-line made her breathing challenging and

that she would like to return to her position in the Rework department. Ankney passed along the note to Fuller in HR. There is some dispute about what happened next. Fuller testified that she then gathered members of DPI's management staff, including Production Manager Richard ("Robbi") Roberts, to discuss how to accommodate Root's need to avoid working around paint fumes. According to Fuller, the immediate consensus from this discussion was that, due to the presence of paint fumes everywhere in the workplace, "it was probably going to be the best thing to have [Root] go home and not be around the paint fumes and discuss with her physician what we did and what, if anything, we can do to accommodate that." (R. 23, Fuller Dep. Tr., PageID 870). But Roberts did not recall this meeting and denied that he took part in "any discussions with any member of management regarding Ms. Root and her having COPD or asthma in relation to breathing paint fumes."

*Root's Discussion with DPI Management.* Later that morning, Root met with Fuller and Roberts. Fuller and Roberts explained that her continued presence at the facility was a "liability" and that they could not continue to have her on the production floor. (R. 23, Root Dep. Tr., PageID 871, 878–79; R. 24, Roberts Dep. Tr., PageID 997; R. 21, Root Dep. Tr., PageID 554). Fuller testified that when Root interpreted their conversation to mean that she was fired, Fuller tried to clarify that this was not DPI's intention. In contrast, Root testified that the short conversation ended in her termination. Regardless, after advising Root that her presence on the production floor was a liability, Fuller told Root that she would need to leave the plant. Fuller and Roberts also explained to Root that she would need to obtain further information from her doctor regarding her tolerable proximity to paint fumes before returning. Root flatly denies that Fuller and Roberts made any such request, and points out that Fuller did not give Root any medical certification forms to launch the accommodation process. Fuller also did not maintain a record of the conversation.

Root left the meeting and returned home. The parties also disagree about what happened next. Fuller says she contacted Root a few days later to check on the status of her follow-up with her doctor. Root disputes that Fuller made any contact with her and points out that her phone records do not reflect receipt of any such call. All agree that Root did not return to work in the days that followed. After two days, Fuller backdated Root's absences as "unexcused," and DPI purportedly terminated Root due to her absences.

## B.

On August 9, 2021, Root filed suit asserting two counts of disability discrimination (discriminatory discharge) in violation of the ADA, 42 U.S.C. § 12101 *et seq.* and O.R.C. § 4112.01 *et seq.* (Count II and Count III); two counts for failure to accommodate in violation of these same statutes (Count IV and Count V); and one count for retaliation in violation of the FMLA, 29 U.S.C. § 2615(a) (Count I). After completing discovery, Root filed a motion for partial summary judgment as to Counts II through V, and DPI filed a motion for summary judgment on all counts. The district court denied Root's motion and granted DPI's in its entirety. Regarding Root's ADA and state law disability discrimination claims, the district court found that Root's failure to show that she could work around paint fumes left her unable to establish that she was "otherwise qualified" for her position. The court therefore concluded that Root failed to make out a prima facie case for her disability discrimination and failure to accommodate claims. Root timely appealed.

## II.

We review de novo a district court's grant of summary judgment. *See Hrdlicka v. Gen. Motors*, *LLC*, 63 F.4th 555, 566 (6th Cir. 2023) (citing *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016)). Summary judgment is appropriate if there is no "genuine dispute of material fact,"

and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248 (1986). Accordingly, "[t]he moving party bears the burden of demonstrating that there is no genuine dispute of material fact." *Hrdlicka*, 63 F.4th at 566 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In evaluating whether such a dispute exists, the court must "view all evidence in the light most favorable to the nonmoving party." *Tennial v. United Parcel Serv.*, *Inc.*, 840 F.3d 292, 301 (6th Cir. 2016). A non-movant can establish the existence of such specific facts through "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in the record. *Anderson*, 477 U.S. at 247.

### III.

Root contends that the district court erred in granting summary judgment to DPI on Root's failure-to-accommodate claims and her discriminatory-discharge claims. Specifically, she asserts that there remains a genuine dispute of material fact as to whether she was otherwise qualified to perform her job. We agree.

### A. Failure to Accommodate.

The ADA prohibits discrimination against a "qualified individual" based on disability. 42 U.S.C. § 12112(a). Because the Ohio anti-discrimination law "mirrors the ADA," we apply the "legal standard under the ADA to claims brought under both laws." *King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 560 (6th Cir. 2022). The parties agree that the analysis is the same between the ADA and O.R.C. § 4112.02. Thus, Root's state and federal failure-to-accommodate claims succeed or fail on the merits together.

To begin, "an employer's failure to grant a reasonable accommodation to a disabled employee falls under the ADA's definition of discrimination." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d 805, 811 (6th Cir. 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). In failure-to-accommodate cases, we employ a multi-part, direct evidence test to analyze whether an employee's claims are actionable. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (recognizing that claims for failure to accommodate "necessarily involve direct evidence"). Under this test, a "plaintiff must show (1) that she is an individual with a disability, and (2) that she is otherwise qualified for her job despite the disability '(a) without accommodation from the employer; (b) with an alleged "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation.'" *Id.* at 852 (quoting *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated in part on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019)).[1]

1.

*Otherwise Qualified.* To meet her prima facie burden, Root must establish that she is "otherwise qualified for her position, with or without reasonable accommodation." *King*, 30 F.4th at 560. Accordingly, Root's status as a "qualified disabled person," raises "two distinct questions." *Id.* The first question asks whether Root could perform the "essential" functions of a production associate, with or without an accommodation. *Id.*; *see also* 42 U.S.C. § 12111(8). "A job function is 'essential' if removing the function would 'fundamentally alter[ ]' the job." *King*, 30 F.4th at 560 (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 762 (6th Cir. 2015) (en banc)); *see also* 29 C.F.R. § 1630.2(n)(1). The second question asks whether Root needed an accommodation to

---

[1] The district court found, and we agree, that Root's breathing difficulties rendered her disabled for purposes of the ADA.

perform her job's essential functions, and whether that "required accommodation [was] reasonable." *King*, 30 F.4th at 560. The district court found that Root was not qualified to work as a production associate even with an accommodation because "exposure to paint fumes" was an essential function of all jobs at DPI. (R. 34, PageID 1610). The court determined that Root's accommodation request was to avoid paint fumes altogether and that such a request was unreasonable because it amounted to a requirement for exposure to "zero . . . paint fumes" in an environment where zero-exposure was not possible. (*Id*. at 1608). On appeal, the parties do not dispute that some exposure to paint fumes is an essential job function or that Root requested an accommodation by submitting her doctor's note. Rather, they disagree on the scope of Root's limitations and whether she could perform her job as a production associate with a reasonable accommodation. Viewed in this frame, the parties' dispute boils down to the questions of what Root could tolerate in her physical work environment, and whether her request in that regard was reasonable.

*Individualized Inquiry.* The first step for an employer in determining whether an employee with a disability is qualified to perform her job is to undertake "an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question" before making a decision as to the employee's ability to perform in a job. *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000). Root contends that DPI failed to conduct any such individualized inquiry and instead summarily concluded that her breathing maladies precluded her from performing the essential functions of a production associate. We agree, in that DPI's conclusion on this point was largely, if not wholly, driven by its interpretation of Dr. Hagerman's letter concerning Root's medical condition. Both Fuller and Roberts recognized that they needed more information about Root's medical condition

before they could determine her capabilities. Yet, according to Root, rather than seeking clarity, DPI immediately shut down discussions by telling her she was a liability, terminating her, and making no further inquiry about her physical limitations. Fuller's testimony that she contacted Root a few days after their initial meeting to follow up about obtaining more information at best demonstrates a dispute of fact on the issue. And even there, Root has countered with phone records that seemingly undermine Fuller's account in this regard. We do not mean to suggest that Root had no responsibility to provide the requisite information, but DPI's role was not passive. Having been presented with evidence suggesting the need for a disability accommodation, DPI had a duty inquire further. *Kleiber*, 485 F.3d at 871 (noting that the interactive process requires participation on both the employee's and the employer's behalf). And while DPI insists that it did so, evidence on this point is in genuine dispute. Moreover, as discussed more fully below, Root has come forward with additional evidence to support her claim that her limitations were not as extensive as DPI supposed and did not preclude her from performing the essential elements of the job. For instance, Root successfully performed the production associate job for nearly three and a half years when she was in Rework, even though that position occasionally required her to spend up to two hours at a time some days working on other lines—including the D-line—with higher exposure to paint fumes.

*Reasonable Accommodation*. Root further contends that she was qualified to perform the job of production associate with the reasonable accommodation of being assigned to Rework. As an initial matter, "the employee bears the burden of proposing an accommodation that will permit her to effectively perform the essential functions of her job." *Ford Motor Co.*, 782 F.3d at 763. (emphasis omitted) (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010)). Under the ADA, a reasonable accommodation may include "job restructuring, part-time or

modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices," and more. 42 U.S.C. § 12111(9)(B). Root argues that her accommodation request was to be reassigned to Rework, not to avoid all paint fumes. When relying on a request for reassignment as a reasonable accommodation, "a plaintiff must show either that '[s]he requested, and was denied, reassignment to a position for which [s]he was otherwise qualified' or that '[s]he requested and was denied some specific assistance in identifying jobs for which [s]he could qualify.'" *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 419 (6th Cir. 2020) (quoting *Burns v. Coca-Cola Enters. Inc.*, 222 F.3d 247, 258 (6th Cir. 2000)). Once an employee requests assistance to identify a vacant position "the employer has a duty under the ADA to ascertain whether [it] has some job that the employee might be able to fill." *Burns*, 222 F.3d at 257 (internal brackets omitted) (quoting *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 483, 487 (7th Cir. 1997)). Generic requests for assistance, such as, "I want to keep working for you—do you have any suggestions?," are no excuse for the failure to ascertain what accommodations and open positions may be available. *Fisher*, 951 F.3d at 419 (quoting *Burns*, 222 F.3d at 257). In other words, an employee seeking an accommodation need not use magic words to trigger further conversation. Yet, overcoming summary judgment generally requires a plaintiff to identify the specific job sought and demonstrate that she is qualified for that position. *Kleiber*, 485 F.3d at 870.

Here, Root has come forward with sufficient evidence to establish a genuine issue of material fact as to whether her requested accommodation was to be assigned to Rework, rather than to completely eliminate her exposure to paint fumes. First, Root presented her letter from Dr. Hagerman, which apprised DPI of the breathing difficulties that purportedly had been triggered by her exposure to paint fumes on the D-Line. *See Mobley v. Miami Valley Hosp.*, 603 F. App'x 405, 413 (6th Cir. 2015) (finding letter from employee's physician sufficient to notify employer

of the need for accommodation). She also informed DPI that she wanted to go back to her former position in Rework. And Dr. Hagerman testified that "[Root] just wanted to go back to her old department so she didn't have that exposure. She said the smell of paint fumes was worse in the new environment with the new job." (R. 25, Hagerman Dep., PageID 1116-17). Construing the facts in the light most favorable to Root, Root's request was also more specific than the request described in *Fisher*: "I want to keep working for you—do you have any suggestions [that are not this specific spot on D-line]." 951 F.3d at 419; *see also Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004) (finding employee is not required to use magic words such as "accommodation" and "disability"; but rather, whether "a factfinder could infer that [the interaction] constituted a request for an accommodation"). Though DPI points out that Root did not specifically mention going back to Rework during her meeting with Fuller and Roberts, the aforementioned evidence is sufficient for a reasonable juror to conclude not only that Root sought an accommodation, but also that the specific accommodation was to be reassigned to Rework.

Undeterred, DPI argues that even if Root's request was to be transferred back to Rework, it was not a reasonable request because Rework was not a distinct position. DPI asserts that production associates' duties included shifting to whatever position in the plant needed support. And as it pertains to Root, the exigencies of the COVID-19 pandemic required her to work in a different area than usual. Consequently, Root would still be exposed to the offending paint fumes, which—according to DPI's interpretation of her physical limitations—would not address her disability. But this argument relies on DPI's premature conclusion that Root required a zero-exposure environment; its failure to perform an individualized inquiry into Root's limitations forecloses this argument. Moreover, while DPI disputes that there is any area in the plant that is completely devoid of fumes, it does not contest that the levels vary from one area to the next. And

as discussed, Root has marshaled record evidence to demonstrate that zero-exposure was neither what her disability required nor what she was requesting.

Thus, viewing the facts in the light most favorable to Root, she has established a genuine dispute of material fact as to whether her request to return to the vacant spot she left in Rework was unreasonable. Given that Root had worked the entirety of her career in Rework before this instance, with no disabling effect on her breathing, reassigning her to that group to accommodate her disability could have permitted her to satisfy the production associate role. *Cf. Holiday*, 206 F.3d at 646 (6th Cir. 2000) (finding that plaintiff's "successful performance of police jobs" was evidence supporting his assertion that he was qualified for a police role); *Shefferly v. Health All. Plan of Mich.*, 94 F. App'x 275, 282 (6th Cir. 2004) ("Because she received satisfactory performance ratings, Shefferly was qualified for the management position she held at that time."). Therefore, Root's proposed accommodation to transfer back to Rework's vacant position was not necessarily unreasonable under the ADA. *See* 42 U.S.C. § 12111(9)(B); 29 C.F.R. pt. 1630, app. § 1630.2(o); *Burns*, 222 F.3d at 257; *see also Fisher*, 951 F.3d at 419–22 (noting that a transfer to a vacant position could serve as a reasonable accommodation). We think a reasonable factfinder could agree under these circumstances and conclude that Root was qualified, with a reasonable accommodation, for the vacant Rework position.

2.

*Failure to Participate in the Interactive Process*. Root also maintains that DPI failed to participate in the interactive process. Because the district court concluded that Root was not otherwise qualified for the job, it did not address this issue. For the reasons stated above, there exists a genuine dispute of material fact as to whether DPI engaged in a good-faith interactive process with Root after she requested her accommodation. Although Root had the burden to propose an

accommodation that would permit her to effectively perform the essential functions of her job, DPI had a mandatory accompanying duty to conduct an individualized inquiry into possible accommodations. *See Jakubowski*, 627 F.3d at 202; *King*, 30 F.4th at 564.

Assuming that Root did request to move back to Rework, as this Court must for purposes of summary judgment, the record supports Root's theory that DPI failed to engage in the interactive process to adequately communicate that her proposed accommodation was unreasonable and explain why. Viewing the facts in the light most favorable to Root, DPI did not engage in *any* dialogue regarding Root's limitations, much less a good-faith interactive process. *Cf. Canny v. Dr. Pepper/Seven-Up Bottling Grp., Inc.,* 439 F.3d 894, 903 (8th Cir. 2006) ("Dr Pepper's perception that the accommodations Canny suggested were impractical did not relieve Dr Pepper of its obligation to discuss possible accommodations that were available and appropriate."); *Keith v. County of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (holding that summary judgment was not warranted on the issue of whether the employer adequately engaged in the interactive process because the employee "met his burden to show that a reasonable accommodation was possible"). Accordingly, summary judgment is not appropriate with regard to Root's interactive process claims.

## B. Discriminatory Discharge.

Root also maintains that Roberts and Fuller told her that her disability was a liability for DPI and fired her on July 21, 2020, because of it. She asserts these actions provide direct evidence of discrimination, which precludes summary judgment in DPI's favor. Importantly, ADA discrimination claims are "analyzed under two different rubrics, depending on whether the plaintiff relies on 'direct' or 'indirect' evidence of discrimination." *Fisher*, 951 F.3d at 416 (citing *Ferrari*, 826 F.3d at 891–92). "Direct evidence of disability discrimination 'does not require the fact finder

to draw any inferences to conclude that the disability was at least a motivating factor.'" *Id.* (quoting *Hostettler*, 895 F.3d at 853) (cleaned up). Under the direct evidence test, as with her failure-to-accommodate claim, Root would have to prove that she was (1) disabled; (2) otherwise qualified for the position, with or without an accommodation; and (3) subject to an adverse employment action because of her disability. *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 298 (6th Cir. 2019). DPI maintains that the indirect test applies. To make out a discriminatory discharge claim using indirect evidence, Root would have to satisfy the *McDonnell-Douglas* framework by demonstrating that (1) she is disabled; (2) she was otherwise qualified for the position, with or without reasonable accommodation; (3) she suffered an adverse employment decision; (4) DPI knew or had reason to know of Root's disability; and (5) the position remained open while the DPI sought other applicants or that Root was replaced. *See Ferrari*, 826 F.3d at 891–92. The burden would then shift to DPI to articulate a non-discriminatory explanation for the employment action, and if DPI did so, the burden would shift back to Root to prove that DPI's explanation was pretextual. *Id.*; *see also Morrissey*, 946 F.3d at 298; *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007). Disputed factual issues prevent summary judgment under either rubric here. As discussed, there exist genuine disputes of fact as to the second prong under both tests. And while DPI insists that Root's claim also fails on the remaining prongs of the indirect evidence test, the parties' competing factual claims about how Root's departure from DPI occurred forecloses resolution of Root's claim based on that test. We explain below.

If the record showed that DPI fired Root right after telling her that her disability was a liability, this fact, along with evidence that she was otherwise qualified for her job, might have been enough to satisfy direct evidence of discrimination requirement under the ADA as Root contends. But the facts are contested in that regard, with DPI providing evidence of a different

sequence of events that resulted in Root's departure from the company. Specifically, DPI says that Root voluntarily abandoned her job two days after her meeting with Fuller and Roberts when she failed to report to work for two days with no excuse and no notice. Under DPI's policy, any employee who has an unexcused absence is subject to termination. Here, DPI backdated Root's attendance sheet to mark her absences as "unexcused," and based on these unexcused absences, DPI asserts that Root voluntarily quit. Indeed, Root's version of events is directly contested by Fuller's and, to a lesser extent, Roberts's testimony. And DPI's version of events is directly disputed by Root's testimony and her phone records, which refute Fuller's claim that she contacted Root to follow up in part about her absence. Under DPI's version of events, we would apply the indirect-evidence test, utilizing, in the process, *McDonnell-Douglas* burden shifting. However, each party cites evidence in favor of their own version of events, and the jury should have the opportunity to determine which to credit. In short, on this record, these genuine disputes of material fact as to when and how Root's employment ended directly affect how DPI's actions should be assessed. Under such circumstances, summary judgment is not appropriate.

**IV.**

For the foregoing reasons, we reverse the district court's judgment and remand the case to the district court for further proceedings consistent with this opinion.