RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0210p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MAJOR SMITH, III,

  *Plaintiff-Appellant*,

*v.*

CITY OF TOLEDO, OHIO; WADE KAPSZUKIEWICZ, Mayor, City of Toledo; BRIAN BYRD, Chief, City of Toledo Fire and Rescue Department; LUIS SANTIAGO, Retired Chief, City of Toledo Fire and Rescue Department,

  *Defendants-Appellees*.

No. 20-3434

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:18-cv-02948—Jack Zouhary, District Judge.

Argued: March 3, 2021

Decided and Filed: September 7, 2021

Before: WHITE, LARSEN, and NALBANDIAN, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Norman A. Abood, THE LAW OFFICE OF NORMAN A. ABOOD, Toledo, Ohio, for Appellant. Jeffrey B. Charles, CITY OF TOLEDO, Toledo, Ohio, for Appellees. **ON BRIEF:** Norman A. Abood, THE LAW OFFICE OF NORMAN A. ABOOD, Toledo, Ohio, for Appellant. Jeffrey B. Charles, Edward T. Mohler, CITY OF TOLEDO, Toledo, Ohio, for Appellees.

  LARSEN, J., delivered the opinion of the court in which NALBANDIAN, J., joined. WHITE, J. (pp. 18–20), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

LARSEN, Circuit Judge.  Major Smith, III wanted to be a firefighter.  But he could not perform the critical firefighting skill of cutting a hole in a roof using a chainsaw.  The Toledo Fire and Rescue Training Academy (the Academy) had a policy of dismissing recruits who were unable to perform this skill after the third attempt.  Smith, however, was given nine chances to perform this skill; yet he failed every time.  He was dismissed from the Academy.  Smith argues that he was dismissed because of his race.  The district court disagreed and granted summary judgment to defendants.  We AFFIRM.

I.

The Academy hired Smith as a firefighter recruit in December 2017.  Recruits at the Academy undergo rigorous training in almost three dozen topics.  Each class of recruits is broken up into smaller "squads."  Each squad completes the entire curriculum together.  The curriculum includes both classroom and hands-on learning; recruits then take both written and practical skills examinations.  The Academy gives recruits three chances to pass their practical skills exams.  If recruits do not pass after three tries, they are dismissed from the Academy.

One such exam is the vertical ventilation test.  To perform this task, firefighters cut a hole in the roof of a burning building to release the toxic gasses and pressure that build up inside.  This is an essential skill that firefighters must be able to do quickly and efficiently.  To pass the vertical ventilation test, recruits, wearing full firefighting gear, must climb up a ladder and cut a four-by-four-foot hole in a roof within ten minutes.  Recruits first study this skill in the classroom and then practice on a simulator—a pretend roof with a plywood board in the space where they must cut the hole.  The simulated roof is not attached to a real house, so it is only a few feet off the ground.

Recruits then take the Academy-required practical skills exam for vertical ventilation on a real roof.  These tests are done on houses around the Toledo area that are set to be demolished.  Because it would be impossible to test every recruit in the class on the same house, "homes of

similar construction" are chosen for the test.  Performing this skill on a real roof is substantially more difficult than doing it on the simulator.  After recruits pass the Academy-required vertical ventilation test on a real roof, they take the much easier state certification test on the simulator.

Smith and his squad took the vertical ventilation test in March 2018.  After going through the classroom and hands-on instruction together, they all took the test on the same house. Everyone passed on the first attempt, except for Smith and one other recruit.  The other recruit passed on his second try.  Smith failed both his second and third attempts.  The evaluating instructors noted that Smith hit the ladder with the running chainsaw, "would not follow directions given by instructors for safety," and "repeatedly cut towards his body instead of standing out of the way as he was instructed to multiple times."  Smith was given a copy of his score sheet, which explained why he failed and included the notes from his evaluators.

It was Academy policy to dismiss recruits after failing a practical skill test three times. Chief Sally Glombowski, then-head of training for firefighter recruits, reviewed Smith's exam results and recommended that he be dismissed.  But because the City was trying to attain a more racially diverse fire department, Smith was given another opportunity to take the vertical ventilation test.  No other firefighter had ever been given more than the initial three chances to pass.  And although Academy policy dictated that recruits not be allowed to move on to the next skill if they had failed, Smith was allowed to complete the rest of the course with his squad and to participate in the graduation ceremony, though he was not given a certificate of completion. He was not allowed to take the Academy's final exam or the state certification exam on the simulator because he had not yet passed the Academy exam on the roof.

In May, Smith was given a second set of opportunities to pass the test.  Lieutenant Eric Pinkham testified that he chose a house that was "almost identical" to the house Smith and the rest of his squad had tested on in March, and at the time, Smith agreed that the May house "look[ed] like the same one" as the March house, though he was "not totally sure."  Smith would later testify, however, that when he got on the roof of the May house, it felt like it "had a steeper pitch."  It is undisputed, however, that in one respect, testing on the May house should have been easier; it had a newer roof and fewer layers of shingles than the house that was the site of Smith's first failed attempts.

Before the May test, the Academy provided Smith with eight hours of individual instruction and practice with three trainers. At the end of his training session and before testing, instructors asked Smith if he had any questions or wanted more practice. He said no.

Smith again failed each of his three attempts. Instructors noted that he again hit the ladder with the running chainsaw, broke a rafter under the roof, and continued to cut toward his body with the chainsaw. Chief Glombowski again recommended that Smith be dismissed from the Academy. Although Fire Chief Luis Santiago initially agreed, he later argued that Smith should be given another chance because of timing inconsistencies during the May testing. Specifically, the examiners started the timer when Smith was at the base of the ladder in the May tests, while they had started the timer when Smith was on the roof in the March tests.

Tensions were high. Some members of the local African-American community believed that Smith was the target of racial discrimination, and Mayor Kapszukiewicz addressed some of those concerns at a meeting. After the meeting, Smith was given yet another set of three attempts to pass the test. He was given another round of individual instruction and was tested on the same roof he had tested on in May. Battalion Chief David Hitt, also African-American, was there to observe and ensure that the test was fairly administered. A representative from the City's Office of Diversity and Inclusion was also present.

During his training for the June test, Smith again mishandled the chainsaw. Though he had been repeatedly instructed otherwise, he cut toward his body; Chief Hitt, who observed the June training, noted that this would constitute "an immediate fail" on an actual exam. The chainsaw stalled out several times. Hitt thought that Smith needed more work on his sawing skills. But though instructors asked Smith, before his first testing attempt in June, if he would like more practice, Smith declined, saying "I need no more practice; let's get this over with." Later, at his deposition, he explained that he did not want to take up more time because "they [were]n't gonna pay [him] overtime," he "had already had three attempts at practicing and [he] felt good about it," and he wanted to "just try to finish it and try to get it done as quickly as possible."

Observing the June test, Chief Hitt could tell that Smith could not handle the chainsaw correctly and struggled to balance and maneuver on the roof. Hitt thought the height and pitch of the roof were too steep, "totally unsuitable for [Smith's] skill level" and "tough [even] for a seasoned firefighter." He also criticized the instructors for choosing a house that already had cuts in the roof, which limited the space available for Smith to do the test, and for inadequately training him in the areas in which he so clearly needed help. Hitt knew that, given the difficulties of the test and Smith's inadequate skill level, Smith was not going to pass the test.

Smith failed the test all three times he attempted it. During one attempt, the chainsaw stalled out and it took Smith two to three minutes to get it started again. An evaluator wrote that "[e]ven with all the instruction and practice [Smith] acts as if it's the first time he has ever used [a chainsaw]," "[t]he chainsaw was so poorly used that it failed to start for the second attempt that day," and "Recruit Smith will harm himself if we continue this." Smith was dismissed from the Academy the next day.

Smith then filed a lawsuit in federal district court. He sued the City of Toledo; Wade Kapszukiewicz, Mayor of the City of Toledo; the City of Toledo Fire and Rescue Department (TFRD); Brian Byrd, Chief of the TFRD; and Luis Santiago, Retired Chief of the TFRD. He later voluntarily dismissed TFRD from the case. He claimed racial discrimination, in violation of 42 U.S.C. §§ 1981 and 2000e-2(a)(1) (Title VII) and Ohio Rev. Code (ORC) § 4112.02; deprivation of a liberty interest, in violation of 42 U.S.C. § 1983; conspiracy to violate civil rights, in violation of 42 U.S.C. §§ 1985(3) and 1986; and intentional infliction of emotional distress under Ohio law. He also filed generic claims of "respondeat superior."

Defendants moved for summary judgment. The district court granted summary judgment to defendants on all claims and denied Smith's request for additional discovery. Smith now appeals.

II.

A.

We review a district court's grant of summary judgment de novo. *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016). Summary judgment is warranted if the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We construe reasonable inferences from the facts in favor of the nonmoving party and do not weigh the evidence or make credibility determinations. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). The party opposing the motion must show that "there is a genuine issue for trial" by pointing to evidence on which "a reasonable jury could return a verdict" for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted). However, mere allegations are not enough to show a genuine issue of fact. *Id.* "[T]here must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252.

B.

Smith alleges that defendants discriminated against him on the basis of race, in violation of Title VII, 42 U.S.C. § 1981, and ORC § 4112.02. We analyze Smith's state-law discrimination claim and his § 1981 claim under the same framework we use for his Title VII claim. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 512 (6th Cir. 2009); *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008); *Ohio Civ. Rts. Comm'n v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 674 (Ohio 1994).

1.

A plaintiff can characterize a racial discrimination claim as single-motive (i.e., that race was the sole motivating factor) or mixed-motive (i.e., that race was a motivating factor among other, legitimate factors). *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008). In addition, a discrimination claim can be supported with direct or indirect evidence of discrimination. *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997). Because Smith argued that racial discrimination was the sole motivating factor behind his dismissal and did not

present any direct evidence of discrimination, the district court analyzed his claim using the test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).[1]

That analysis proceeds in three steps. First, Smith must make out a prima facie case of discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016). Once he does, the burden shifts to defendants to articulate a legitimate, nondiscriminatory reason for their decision. *Id.* The burden then shifts back to Smith to show that the reason the employer gave "was not its true reason, but merely a pretext for discrimination." *Id.* (quoting *White*, 533 F.3d at 391–92). To make out a prima facie case, Smith must show that "(1) [he] is a member of a protected group; (2) [he] was subjected to an adverse employment decision; (3) [he] was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably." *Id.* (alteration adopted) (quoting *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004)).

Defendants argue that Smith's prima facie case fails because he was not qualified and cannot show that similarly situated recruits of a different race were treated better than he was. Alternatively, defendants argue that Smith cannot show that the stated reason he was dismissed from the Academy—because he failed the vertical ventilation test—was actually a pretext for race discrimination.

---

[1]Smith claims that the district court erred by failing to undertake a mixed-motive analysis and by failing to consider direct evidence of discrimination. But Smith did not present his case to the district court as a mixed-motive case and, even on appeal, does not explain how a mixed-motives analysis would help him. Nor did he provide the court with direct evidence. "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Direct evidence of discrimination proves "not only discriminatory animus, but also that the employer actually acted on that animus." *O'Donnell*, 838 F.3d at 725 (quoting *Johnson v. Metro. Gov't of Nashville*, 502 F. App'x 523, 534 (6th Cir. 2012). Such evidence is "rare." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). And Smith did not provide any. Smith's opposition to the motion for summary judgment noted generalized, second-hand accounts of alleged discrimination between 1998 and 2014, particularly against another person, Chief Brian Byrd. But allegations of discrimination at different times against different people are not direct evidence of discrimination against Smith. *See O'Donnell*, 838 F.3d at 726; *see also Rowan* at 550. Moreover, Smith himself portrayed this evidence not as direct evidence but as evidence of "pretext" or as "*prima facie* evidence" of a "practice" or a "pattern of racial discrimination acted out on Plaintiff." And, as Smith provided no citations to the record, the district court was not obligated to consider this evidence at all. *See* Fed. R. Civ. P. 56(c)(3). The district court did not err in analyzing Smith's discrimination claim as he presented it: as a single-motive claim supported by indirect evidence.

With respect to the prima facie case, Smith has not identified a comparator—that is, someone of a different race, who was similarly situated to him, but who was treated better. *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) ("[T]he plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the relevant aspects." (citation, quotation marks, and emphasis omitted)). There were thirty recruits in Smith's class. Three of them, including Smith, were African-American, two were women, and two were Hispanic. One of the African-American recruits, Anthony Bronaugh, took different employment with the City of Toledo and did not become a firefighter.[2] Of the remaining twenty-nine recruits, twenty-seven passed the vertical ventilation test on the first try; the twenty-eighth passed on his second try; Smith never passed, despite nine attempts. It is undisputed that no recruit, other than Smith, has ever been offered more than three chances to pass the test. And there is no evidence that any recruit has ever graduated from the Academy without passing the test. It appears, therefore, that Smith has failed to identify anyone, of any race, who was similarly situated to him but who was treated better. *See Arucan v. Cambridge East Healthcare Center/Sava Seniorcare, LLC*, 763 F. App'x 415, 420 (6th Cir. 2019) (stating that because no other therapist had "ever treated the wrong patient," the employer "has never had an employee who is 'similarly-situated' . . . meaning that [the employer] could not have treated such an employee differently").

But, Smith says, this is because his test was rigged. He claims the defendants "manufactured" his failure through their "wholly inadequate" training and testing of him. If by inadequate, Smith means "unequal," then the legal principle Smith asserts is surely right. An employer cannot claim to dismiss employees according to a neutral criterion, like passing a test, if it actually gives different and harder tests to some employees because of their race. *See Johnson v. Louisiana*, 351 F.3d 616, 622–24 (5th Cir. 2003); *Sledge v. Goodyear Dunlop Tires*, 275 F.3d 1014, 1020 (11th Cir. 2001) (per curiam).

How such a claim fits into the *McDonnell-Douglas* framework is unclear. We might analyze such a claim at the prima facie case stage—Smith could show that "similarly situated non-protected employees were treated more favorably," *see Jackson*, 814 F.3d at 776, by

[2]There is no evidence in the record that Bronaugh failed, or even took, the vertical ventilation test.

showing that they were given an easier test.  Or we might consider it, as Smith seems to suggest, at the stage of showing pretext—Smith might show that the employer's stated reason for dismissing him (failing the test) was not its "true reason," *see id.*, if, in fact, the test was a sham. Sometimes, as our cases show, the "same evidence is germane to each inquiry." *McCarthy v. Ameritech Publ'g, Inc.*, 763 F.3d 469, 482 (6th Cir. 2014); *see also Jackson,* 814 F.3d at 779. But whether we deploy this legal principle at the prima facie case stage, or at the point of showing pretext, Smith's case fails for a want of evidence showing that the Academy gave him a materially harder test than it gave to recruits of other races.

The parties do not dispute that being able to properly perform vertical ventilation is an essential firefighting skill.  Vertical ventilation protects the lives of firefighters and those inside of a burning building.  And as Chief Hitt acknowledged, firefighting is dangerous; errors of action or inaction can get firefighters killed in the line of duty.

The Academy requires recruits to pass the vertical ventilation test on a real roof before they can take the state test on a simulator.  And Smith never passed the test on a real roof.  There is no dispute on these two points.  Yet Smith suggests that summary judgment was inappropriate because a fact dispute remains over whether the Academy's "real roof" test is also a requirement for state certification.  We disagree.  Whether this is strictly an Academy requirement or also a state requirement is immaterial.  There is no dispute that every recruit, not just Smith, was required to pass the Academy's test on a real roof.  Smith acknowledges that the Academy may require more of its recruits than the state minimum and concedes that it is not unfair for the Academy to require that he take a real roof test.

Still, Smith suggests that his failure to pass the Academy's vertical ventilation test was not a proper reason to dismiss him because his test was harder than the test given to his classmates.  The defendants, he claims, "manufactured" his failure through their inadequate and unfair training and testing.

This claim does not even get out of the starting gate with respect to the first round of testing in March.  The evidence in the record shows that before the March test, Smith got the

same instruction as the other recruits in his squad. The whole squad then tested on the same roof. That training was sufficient to enable everyone but Smith to pass the March test.

Even so, Smith was offered an unprecedented second round of tests in May, and then a third in June. But Smith says that the training and testing in these rounds was so unfair "that there was no way [he] could pass the test." To show this, Smith must demonstrate, at least, that the conditions of his May and June tests were materially worse than the tests he and his classmates took in March. Smith was tested on the same house in May and June, but that house was different than the one he tested on in March. Defendants acknowledge that they cannot test every recruit on the exact same roof. The vertical ventilation test is performed on real homes that are slated for demolition; it would be impossible to test every recruit on the same roof. So the Academy chooses "homes of similar construction."

Lieutenant Pinkham explained that he chose the house that Smith tested on in May and June because it was "almost identical" to the one Smith had tested on in March. When asked about the style of the roof before his May test, Smith agreed that it looked like the roof he had tested on in March. But Smith testified that once he got on the roof, "it did not feel like the exact same one. [He] couldn't really stand up and cut on this roof because it had a steeper pitch."

Yet, while the roof may have been steeper, Smith never alleges that the pitch of the roof was materially steeper than those used by the other recruits in his class. Private Keevin London, another African American recruit in Smith's class, said that the roof he and the other members of his squad tested and passed on was similar to the roof Smith tested on in May and June. And indeed, the district court was not able to discern any material differences in the pitches of the roofs in its review of the photographs. Neither can we. Furthermore, there is no dispute that at least one condition of the roof Smith tested on in May and June made for a safer and easier test than the one he took with the rest of his squad in March: the roof was newer and had fewer layers to cut through. Smith's testimony that the pitch of the roof he tested on in May and June felt steeper, without any comparison to the roofs normally used, is not sufficient to permit a reasonable juror to conclude that the house Smith tested on in May and June was materially unequal to the houses his classmates tested on. *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009).

Nor are Smith's claims that he was given inconsistent instructions sufficient to raise a genuine dispute about whether he was given unequal training ahead of the May and June tests. Smith says that he was not consistently instructed to "cut away from [his] body." He also says that different instructors taught him different methods, which "made [for] some confusion." But again, to succeed on a Title VII claim, he has to show that he was treated differently (and worse) than others not of his race; he cannot succeed on a Title VII claim simply by claiming that the level of instruction was generally poor. His claims about his equipment problems fail for similar reasons: though he complains that the instructors allowed the time to run while the chainsaw stalled, he does not point to any evidence showing that the instructors stopped the clock for his classmates. And he acknowledges that he was not the only one who struggled to use the chainsaw. He noted that during training, those who had used a chainsaw before found it easier "to turn [the chainsaw] on and manipulate [it], but the ones that never did had issues with it as well."

The evidence in the record shows that before the first round of testing in March, Smith got the same instruction as the other recruits in his squad. He has not disputed this. That training was sufficient to enable all of his classmates to pass the test. After he failed the March tests, Smith was given his score sheet and a packet of other information to review ahead of the May tests. The score sheet, which documented his failed attempts, explicitly said "Smith repeatedly cut towards his body instead of standing out of the way as he was instructed to multiple times." Smith signed a document indicating that he had received this information to review. Then, Smith was given additional, individual instruction before the May and June tests, an opportunity no other recruit had ever been given. Even if Smith were genuinely confused on proper cutting technique between the March and May tests, he was given ample opportunity but declined to ask questions or to further practice his sawing technique before the May tests. In addition, he acknowledged in a memo to Chief Glombowski before the June testing that he was told to cut "upwards and away from your body." This shows that, even assuming he was "not taught that way before," he understood the correct way to cut before the June testing. Lastly, he again declined the opportunity to ask questions and practice his cutting technique more, saying that he understood and that he was ready to go.

For similar reasons, Smith's claim is not aided by the testimony of Chief Hitt. Hitt observed Smith's June training and testing and believed that "things were not done properly." Hitt believed that Smith's instructors had not sufficiently demonstrated how to use a chainsaw or how to perform the skills that would be tested. He thought that the pitch of the roof was too steep for Smith to maneuver, and would have been tough even for a more seasoned firefighter, and that the instructors should have chosen an un-cut roof so that Smith would have more space available to him. Hitt also testified that when he was an instructor at the Academy, they did not allow anyone to fail because they would not test recruits until they were ready to pass.

Yet Hitt's testimony does not advance Smith's claim of race discrimination. Smith must show that his testing and training conditions were materially different (and worse) than those used to prepare and test the other recruits. *See Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019). Hitt did not observe the training or the test conditions of any other recruit, so his testimony cannot shed light on whether Smith was treated less favorably than others. Furthermore, his testimony about how the Academy trained and tested recruits when he was an instructor does not show how the Academy trains and tests now. Hitt left the Academy in 2008, almost ten years before Smith started as a recruit. Hitt's testimony that recruits were trained differently ten years before Smith entered the Academy does not show that Smith was trained and tested differently than his contemporaries.

Hitt testified that when he was an instructor at the Academy, they would not test recruits until they were certain to pass. Hitt suggests that this is the better policy. But again, that testimony does not bear on the comparative question: was Smith treated worse than his classmates? And in any event, the record shows that before the June tests, which were performed on the same roof as in May, Smith was offered additional practice and training. Yet Smith declined, instead telling instructors, "let's get this over with" and that he "need[ed] no more practice." Smith says this was "[b]ecause I had already had three attempts at practicing[,] and I felt good about it." No reasonable juror could conclude, on these facts, that Academy instructors insufficiently trained Smith, because of his race, and in order to manufacture his failure, as Smith argues.

Finally, Smith argues that evidence of discrimination in the fire department shows that the Academy's justification for dismissing him was pretextual. We have recognized that "discriminatory statements" may establish "the existence of a discriminatory atmosphere," which, in turn, could contribute to a finding of pretext. *See Ercegovich*, 154 F.3d at 356. However, we have also said that "[a]ctions by nondecisionmakers cannot alone prove pretext," nor can "decisionmakers' statements or actions outside of the decisionmaking process." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 768 (6th Cir. 2015) (en banc). Finally, we have noted that "rumors, conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992).

Smith offers affidavits from others who say that Chief Brian Byrd told them that he had self-demoted from his position as Deputy Chief of the fire department in 2016 because of rampant racial discrimination in the fire department. He has also submitted an affidavit from Professor Earl Murry, who wrote that Mayor Kapszukiewicz admitted to being "aware[] of the race discrimination problems in the TFRD."

Assuming that these statements are admissible, they are insufficient to establish that discriminatory animus motivated the Academy's decision to dismiss Smith. Allegations of racial discrimination by unknown persons against Chief Byrd several years before Smith entered the Academy are too abstract and attenuated to indicate that Smith's supervisors at the Academy were motivated by discriminatory animus in their actions against Smith. *See O'Donnell*, 838 F.3d at 726. Furthermore, Smith has not pointed to any specific remarks by his superiors in the Academy that would raise an inference of discrimination against Smith personally or against African Americans in general. A complete lack of detail leaves us unable to "evaluate factors affecting the statement[s'] probative value, such as . . . 'the purpose and content of the statement[s], and the temporal connection between the statement[s] and the challenged employment action.'" *Ercegovich*, 154 F.3d at 357 (quoting *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)). "[C]onclusory allegations and subjective beliefs" are simply not enough to establish pretext. *See Mitchell*, 964 F.2d at 585.

One allegation in the declaration submitted by Murry deserves close scrutiny. Murry describes an August 2018 meeting between himself, Hitt, and newly appointed Chief Byrd at Hitt's home. According to Murry, Hitt described his observations of the June 2018 testing to Byrd and explained "in detail how the training provided was inadequate and the testing was objectively unfair" and designed to assure Smith's failure. Murry then says that, at that meeting, "Chief Byrd agreed with Battalion Chief Hitt's observation that what was done to Major Smith especially in June 2018 was racially motivated and that the TRFD Academy's actions were hostile, discriminatory and *in Chief Byrd's opinion* racially motivated." So on Murry's telling of the story, Byrd admitted that what happened to Smith was racially discriminatory. Byrd has filed an affidavit to the contrary, explaining that once he "reviewed the file materials relative to Smith's training and ultimate termination from the academy," he "found absolutely no indication of any unfair treatment visited upon him because of race or any reason." So what do we make of Murry's declaration?

To begin, we may assume without deciding that these out-of-court statements, made by a named party, would be admissible as non-hearsay under Fed. R. Evid. 801(d)(2). But Smith did not argue before the district court that Murry's recollection of Byrd's statement constituted evidence of racial discrimination; and so the district court did not address it. Although Smith relies on that portion of Murry's declaration on appeal, it is our job "to review the case presented to the district court, rather than a better case fashioned after an unfavorable order." *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) (alterations adopted) (quoting *Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005)). Smith's failure to present this argument to the district court forfeits it for appeal. *Id.*

Beyond the forfeiture, close scrutiny of the declaration shows that Murry's statements are of little effect. As explained above, Hitt was present only at the June 2018 testing and training so he could not speak to the entire course of training and testing that Smith had received; and, critically, he could not compare that training and testing to that received by Smith's classmates. Byrd likewise had no firsthand knowledge of the training or testing, as Byrd neither witnessed nor was involved in Smith's training, testing, or termination; he did not become Chief of the TRFD until August 2018, two months *after* Smith's June tests. So even if Byrd agreed at the

August meeting with Hitt's view that Smith's June testing was racially discriminatory, as Murry recollects, Byrd's agreement was premised on Hitt's telling of the events; and Hitt had no way to assess the critical question whether Smith was treated worse than his peers. As a result, Murry's declaration does not establish pretext.

Smith has not shown either that "similarly situated non-protected employees were treated more favorably," *Jackson,* 814 F.3d at 776, by being given an easier vertical ventilation test or that his having failed the test was not the "true reason" for his dismissal. *Id.* The district court did not err in granting summary judgment to defendants on Smith's discrimination claims under Title VII, § 1981, and Ohio law.

2.

Because Smith's discrimination claims fail, his civil rights conspiracy claims fail as well. "Section § 1985(3) prohibits a conspiracy 'for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws.'" *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 314 (6th Cir. 2005). To prove a § 1985(3) claim, a plaintiff must show, among other things, that "a person is . . . deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters & Joiners v. Scott*, 463 U.S. 825, 829 (1983). Smith cannot prove this because, as we explained above, his discrimination claims fail. *See Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 569 (6th Cir. 2002) (dismissing § 1985(3) conspiracy claim where there was no underlying substantive violation).

"Section 1986 establishes a cause of action against anyone, who has knowledge of a conspiracy under § 1985, and 'having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do.'" *Radvansky*, 395 F.3d at 314. Because Smith's § 1985 claim fails, so does his § 1986 claim. *See id.*

C.

Smith's other claims fare no better. He first argues that the district court erred in dismissing his § 1983 claim. Citing out-of-circuit precedent, he alleges that when defendants

told the media that he was dismissed from the Academy for failing to meet state requirements, they deprived him of a "property/liberty interest in his good name[,] which has been 'sullied.'"

This court has consistently recognized that "reputation alone is not a constitutionally protected liberty or property interest." *Cutshall v. Sundquist*, 193 F.3d 466, 479 (6th Cir. 1999) (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). A person's "good name, reputation, honor, or integrity" is not constitutionally protected against defamation where "the employer has alleged merely improper or inadequate performance." *See Crosby v. Univ. of Ky.*, 863 F.3d 545, 555 (6th Cir. 2017) (quotations and citations omitted). That is exactly what defendants did here when they said that Smith "could not successfully complete the ventilation portion of his physical test" and that he was dismissed from the Academy for being "unable to meet the state's standards." As the district court noted, any dispute over whether the standard was actually a state standard, as opposed to an Academy standard, does not sufficiently "affect[] Smith's reputation" to be actionable. *See id.* at 556 (stating that, to be actionable, "statements made in the course of . . . termination" must impose "[a] moral stigma such as immorality or dishonesty capable of seriously damag[ing] his standing and associations in his community or that [would] foreclose[] his freedom to take advantage of other employment opportunities" (first alteration added) (citation omitted)). Smith's § 1983 claim accordingly fails.

Smith's intentional infliction of emotional distress claim also fails. To prove that claim under Ohio law, Smith must show that "(1) defendants intended to cause emotional distress, or knew or should have known that their actions would result in plaintiff's serious emotional distress, (2) defendants' conduct was extreme and outrageous, (3) defendants' actions proximately caused plaintiff's emotional injury, and (4) plaintiff suffered serious emotional anguish." *Miller v. Curie*, 50 F.3d 373, 377 (6th Cir. 1995). Smith alleges that defendants caused him emotional distress by "stripping [him] of his lifelong dream simply because of his race" and "publicly impugn[ing] him and destroy[ing] his good character." But, as we explained above, defendants did neither. The district court did not err in granting summary judgment on this claim.

III.

Finally, Smith argues that the district court erred in denying his request for additional discovery. We review a district court's denial of a motion for additional discovery for abuse of discretion and will reverse only if we are "left with a definite and firm conviction that the court below committed a clear error of judgment." *Fisher v. Nissan N. Am., Inc.*, 951 F.3d 409, 422 (6th Cir. 2020) (citation and quotation marks omitted). Among other factors, we consider "how the discovery would affect the ruling below." *Id.*

Smith asked for additional discovery on state and Academy testing requirements. He argues that defendants had changed their position about whether the Academy vertical ventilation test, which must be performed on a roof, is also a state requirement. He says that this "precondition issue" is relevant to his discrimination claim because if it is not a state requirement, defendants discriminated against him by requiring it and not allowing him to simply take the state certification exam on a simulator. As explained above, whether the Academy rooftop exam is also a state requirement is irrelevant to Smith's discrimination claim. It is undisputed that all recruits, including Smith, were required to pass the Academy's exam on a real roof. Additional discovery on the state requirements would have no effect on his discrimination claims because it could not help show that he was treated differently from any other recruit. The district court did not err in denying Smith's request for additional discovery.

\* \* \*

We AFFIRM.

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part. I agree that the district court properly granted summary judgment to the City of Toledo on Smith's § 1983 and intentional-infliction-of-emotional-distress claims and properly denied Smith's motion for additional discovery. However, because there is a genuine dispute of material fact about whether the City dismissed Smith from the academy because of his race, I would reverse the grant of summary judgment on Smith's discrimination and conspiracy claims.

Smith was given three more chances to pass the vertical-ventilation test in June after the City failed him on the March and May tests. The district court stressed that the May and June tests were opportunities no other recruit had ever received, and seemed to suggest that any discrimination on those tests was irrelevant, although it also found insufficient evidence of discrimination. Smith persuasively argues, and the majority appears to accept, that Smith can meet his burden if he shows that the June tests were materially harder than the March tests or the training was materially worse than received by other recruits. As Smith argues, Defendants cannot offer him another round of tests—and thus condition his continued employment on passing those tests—and then fail him for discriminatory reasons. Further, it is undisputed that Smith's tests in May were timed in a manner that made it more difficult for Smith to pass the tests—i.e., he was given a test that was more difficult to pass even putting aside the dispute about the slope of the roof.

Although the majority recounts evidence supporting the City's contention that the June training and tests were fair, and similar to what other recruits received, Smith presented sufficient evidence to the contrary to go to a jury. Professor Earl Murry's affidavit details that there were concerns about the fairness of prior tests administered to Smith, and that to address any potential issues, Battalion Chief David Hitt would be there to observe the June training and tests. Hitt observed the training and tests and concluded that they set Smith up to fail. The majority summarizes this evidence but says it is immaterial because Hitt did not observe the training or tests of other recruits in Smith's class. At the summary-judgment stage, however, this

evidence should not be summarily cast aside. Hitt's many years of experience in training recruits—as an instructor, as director of the training program, as a recent mentor to trainees, and as a supervisor designated to oversee the fairness of Smith's training and testing process—and many years of experience at the department make him well-suited to determine whether the training was adequate and the testing was fair. Hitt's testimony and report indicate that the training Smith received was plainly inadequate because it did not attempt to address Smith's problem areas or provide necessary instruction, such as instructor demonstration or allowing Smith to practice the vertical-ventilation skill and receive feedback. He also explained his opinion that the testing conditions were unfair, not only because the slope of the roof was too steep and there was limited space on the roof to conduct the test, but also that the instructors did not respond appropriately when Smith's chainsaw failed, i.e., they did not stop the time on Smith's test or identify or correct the cause of the equipment failure, "allowing the time to run out on [Smith]." R. 42-2, PID 933.

Smith made similar complaints. He acknowledged that he received training but echoed Hitt's comments that he did not receive many opportunities to actually practice the skill. R. 43-10, PID 1797 ("I did not ever have one time between May even up to June to, besides the simulation one, they were doing the remediation, I only had one practice during that time."). He confirmed that the roof was steeper than the March test. *Id.* at PID 1786 ("I couldn't even stand up and cut on this roof because it had a steeper pitch.").[1] And he complained that the equipment was faulty but that the instructors did not stop the time. Given Hitt's testimony that in his opinion and experience the training and testing conditions were inadequate, and Smith's testimony—based on personal knowledge from being on the roof in March—confirming these points, Smith presented a genuine dispute of material fact about whether his training and testing conditions were similar to those of his white colleagues, and whether the decision to terminate him for failing the tests was pretext for unlawful discrimination. *See* Maj. Op. at 8 ("An employer cannot claim to dismiss employees according to a neutral criterion, like passing a test, if it actually gives different and harder tests to some employees because of their race."

---

[1]Although not specific as to the degree of the disparity between the March and May/June roofs, Smith's testimony that he was unable to stand up and cut could allow a reasonable jury to infer that the difference in slopes was material.

(citations omitted)); *Strickland v. City of Detroit*, 995 F.3d 495, 514 (6th Cir. 2021) ("This Court has long held that evidence of such unjustified differential treatment is sufficient 'to withstand summary judgment on the issue of pretext' and is itself evidence that the 'proffered explanation . . . may not have actually motivated [the employer's] conduct.'" (alterations in original) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1023 (6th Cir. 2000))).

Additionally, the evidence presented of past and ongoing discrimination in the department, some pertaining to others but some pertaining to Smith specifically, strengthens the inference of discrimination. Chief Brian Byrd allegedly stated to Murry that he believed Smith's termination was racially motivated. And, since 2014, 80% of the recruits who were dismissed from the Academy were African American, and the remaining 20% were Hispanic, despite African Americans making up a minority of the class.[2] This further supports an inference of discrimination.

Accordingly, I would reverse the grant of summary judgment on Smith's claims under Title VII, 42 U.S.C. § 1981, and Ohio Rev. Code § 4112.02. Because the dismissal of the conspiracy claims relied solely on the failure of his discrimination claims, I would reverse the grant of summary judgment on those claims as well.

---

[2]In Smith's class, there were three African-American recruits out of a total of 30.