NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0259n.06

Case No. 25-5669

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 08, 2026
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| RENETE BARNETT-MORGAN, | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| INVERNESS TECHNOLOGIES, INC., | ) | |
| Defendant-Appellee. | ) | OPINION |
| | ) | |

Before: GIBBONS, MURPHY, and HERMANDORFER, Circuit Judges.

HERMANDORFER, Circuit Judge. Renete Barnett-Morgan started having trouble at work after her employer, Inverness Technologies, Inc., hired a new office manager. Following reported problems with Barnett-Morgan's conduct on the job, her supervisors called her in for an employee-counseling session. Rather than accept management's feedback, Barnett-Morgan walked out of the meeting, said she was done, cursed at another employee, and left the premises without her access card. Her employment at Inverness ended that day. From these events came the present Title VII suit, in which Barnett-Morgan asserts claims based on racial discrimination and retaliation. The district court granted summary judgment to Inverness on both claims. We affirm.

I

Inverness Technologies, Inc., has a contract with the United States Army to provide transition services to soldiers through the Soldier for Life Transition Assistance Program. To that

end, Inverness employs career counselors to advise and assist veterans, conduct briefings, provide counseling, and otherwise "[f]acilitate" soldiers' "transition from the military environment to the civilian environment." Career Counselor Position Description, R.32-4, PageID 229.

Career counselors work at call centers and provide around-the-clock service to veterans. A contract installation manager (installation manager) supervises the career counselors. The installation manager, in turn, reports up a chain of command to a program manager who oversees the entire contract.

Because the installation manager cannot always be physically present to supervise the career counselors, the installation manager chooses one counselor per shift to act as the "shift lead"—management's "eyes and ears" on any given shift. Barnett-Morgan Dep., R.32-5, PageID 242-43. Serving as shift lead does not change a career counselor's formal job description or pay. Shift leads do "everything the exact same" as the other career counselors, but they have the "added responsibility of letting [management] know if something happened or is not happening on their shift." Vega Dep., R.39-6, PageID 527. That responsibility also includes maintaining schedules, ensuring compliance with policies and procedures, and informing the installation manager if a counselor deviates from the code of conduct. Shift leads, however, have no disciplinary or enforcement authority over their peer counselors.

Barnett-Morgan, a black woman, began working as a career counselor for Inverness at its call center in Fort Knox, Kentucky in 2017. In 2018, the lead for the third shift at Fort Knox departed. Barnett-Morgan volunteered to step in as third-shift lead and did so without interviewing or formally applying.

A few years later, in 2021, Inverness hired Kelley Jeans to be the new installation manager at the call center. In order to make the call center "the model for all other sites," Jeans sought to

ensure that the career counselors under her supervision were "on the same page" about "what [was] expected" of them. Jeans Expectations Email, R.32-7, PageID 274. To that end, Jeans emailed all the career counselors a form outlining an updated set of job "expectations." *Id.* Those expectations included, for example, that a counselor must work her "shift as it is scheduled." *Id.* at PageID 276. Jeans requested that each counselor read, sign, and return the form "to indicate understanding" of the expectations. *Id.* at PageID 274. Barnett-Morgan signed and returned the form on June 23, 2021.

On August 3, 2021, Jeans announced several employee additions to the call center. Among them was Tammy Croft, a white woman, who was rejoining the call center as a counselor. Croft had over eight years of experience working as a career counselor; she had also served as a financial counselor and an interim installation manager at several stations overseas. The email noted that Croft would serve as the new third-shift lead—the role that Barnett-Morgan had previously occupied. Jeans explained that Croft's "wide breadth of experience across the [Transition Assistance Program] and in all roles represented at the [call center]" was the reason Croft was selected as the new third-shift lead. Jeans Staffing-Changes Email, R.39-2, PageID 431.

A few days later, on August 6, Barnett-Morgan found herself in a "heated discussion" with another third-shift counselor, Francis Schirrmacher. Croft Dep., R.39-4, PageID 455. Consistent with protocol, Barnett-Morgan and Schirrmacher each prepared a written statement about the incident for Croft to share with management.

Barnett-Morgan also emailed Inverness's human-resources department (HR) directly about the incident. In her correspondence, Barnett-Morgan claimed that Schirrmacher had "created a hostile work environment" and that the August 6 incident was "not the first time" that Barnett-Morgan "had to encounter this type of behavior" from Schirrmacher. Barnett-Morgan Emails with

HR, R.39-9, PageID 613. As evidence, Barnett-Morgan claimed that in March 2020 Schirrmacher "sprayed Lysol in the face of another counselor." *Id.* In response to Barnett-Morgan's email, HR employees repeatedly asked Barnett-Morgan to provide more details or examples to substantiate her complaint. But Barnett-Morgan never provided that information, instead stating only that she "worr[ied] about retaliation" because Schirrmacher was supposedly dating the supervisor for another shift. *Id.* at PageID 612. Without any additional information corroborating Barnett-Morgan's allegation regarding a hostile work environment, the HR employees replied that they would have no choice but to consider the matter closed. Barnett-Morgan never responded with the requested information.

On August 11, Croft sent a written statement to management regarding issues that she was having with Barnett-Morgan and two other third-shift counselors, both of whom are white. Croft explained that the three counselors had, among other issues, swapped schedules without obtaining the required prior approval, discussed out-of-office coverage with one another instead of with Croft, responded combatively to Croft's requests, failed to cover one of the call center's virtual-messaging programs, and taken inappropriately timed lunch breaks.

So, on August 26, Program Manager Crystal Vega held an employee-counseling session with Barnett-Morgan. During her meeting with Barnett-Morgan, Vega issued a written disciplinary warning to Barnett-Morgan for switching schedules without her shift lead's approval. Going forward, Vega explained, Barnett-Morgan was to work her schedule as assigned, and any changes would require prior approval from the shift lead. Barnett-Morgan, however, refused to sign the employee-counseling form. She "pushed her chair back" and said, "I'm done." Vega Dep., R.39-6, PageID 539. Vega tried to convince her to sit down and talk things through, but

Barnett-Morgan refused. Instead, Barnett-Morgan again said, "I'm done," and walked out of the meeting. Barnett-Morgan Dep., R.32-5, PageID 262.

From Vega's perspective, "it looked like [Barnett-Morgan] was quitting." Vega Dep., R.39-6, PageID 539. It is standard procedure for Inverness staff to collect an employee's access card when they resign, because the card grants the employee access to the job site and work computers. So after Barnett-Morgan left the meeting, Vega told Randy Trombley—the information technology liaison officer—something along the lines of: "If she is quitting, you need to collect her [access] card." Trombley Dep., R.39-7, PageID 574.

The parties disagree on what happened next. According to Trombley, he approached Barnett-Morgan's cubicle to ask her if she was leaving and further stated that if Barnett-Morgan was resigning, he would need to collect her access card. In response, Barnett-Morgan allegedly said, "F**k you, I am tired of you motherf**kers," before throwing her access card to the ground. *Id.* at PageID 572. Trombley also testified that Barnett-Morgan pushed him "off to the side so she could get through" before heading for the exit. *Id.* at PageID 575.

According to Barnett-Morgan, Trombley did not ask if she was quitting; rather, he just walked up and asked for her access card. She admits that she cursed while speaking to Trombley. But she disputes that she threw the access card—she claims that the access card "fell to the floor" when she tried to hand it to Trombley. Barnett-Morgan Affidavit, R.39-1, PageID 426. And she denies shoving Trombley on her way out of the building.

Based on Barnett-Morgan's actions and Trombley's report, Vega believed that Barnett-Morgan had voluntarily resigned. Vega emailed HR to let them know that Barnett-Morgan had "walked out and quit" following her employee-counseling session. Vega Email to HR, R.32-18, PageID 315. She also requested that Barnett-Morgan be placed on a do-not-hire list. Later that

day, Barnett-Morgan emailed HR asking for an explanation of the grounds for her termination. An HR employee responded by explaining that her actions during and after her employee-counseling session led Inverness to believe that she had voluntarily resigned.

On December 3, 2021, Barnett-Morgan filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). She alleged that she experienced race discrimination at Inverness between August 2 and August 21, 2021. She further alleged that she "was demoted from a Shift Lead to a Counselor" and that she was eventually "terminated." EEOC Charge, R.32-23, PageID 332. Barnett-Morgan continued, "I believe I was discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964." *Id.* She did not check the box for retaliation or otherwise mention retaliation in her charge.

Inverness received notice of Barnett-Morgan's EEOC charge on December 6, 2021. In its response, Inverness asserted that Barnett-Morgan was not "demoted" from her role as shift lead because that position "does not include a pay increase for the additional duties[.]" Inverness Response to EEOC Charge, R.39-12, PageID 649. Inverness further stated that Barnett-Morgan was not "terminated" because she voluntarily "walked off the job," and that "there is absolutely no evidence of racial discrimination by Inverness." *Id.* The EEOC issued a right-to-sue letter to Barnett-Morgan on April 27, 2022.

Shortly thereafter, Barnett-Morgan filed this lawsuit against Inverness and Vega in state court, bringing claims of race discrimination and retaliation under the Kentucky Civil Rights Act. Inverness timely removed the case to federal court. Barnett-Morgan filed an amended complaint, adding claims of discrimination and retaliation under Title VII. The district court dismissed all claims save for the Title VII race-discrimination and retaliation claims against Inverness.

Following discovery, the district court granted summary judgment to Inverness. Barnett-Morgan timely appealed.

II

We review the district court's grant of summary judgment de novo. *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 507 (6th Cir. 2021). "Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id.*; *see* Fed. R. Civ. P. 56(c). In conducting this analysis, we must "draw all justifiable inferences" in favor of the nonmoving party. *Briggs*, 11 F.4th at 507 (citation omitted). "However, mere allegations are not enough to show a genuine issue of fact. There must be evidence on which the jury could reasonably find for the plaintiff." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (cleaned up). "This court can affirm a decision of the district court on any grounds supported by the record, even if different from those relied on by the district court." *Brown v. Tidwell*, 169 F.3d 330, 332 (6th Cir. 1999) (per curiam).

III

Barnett-Morgan asserts claims of racial discrimination and retaliation. We affirm the grant of summary judgment to Inverness on both fronts.

A

Title VII prohibits employers from discriminating against employees on the basis of race. 42 U.S.C. § 2000e-2(a)(1). Where, as here, "the record contains no direct evidence of

discrimination," we apply the *McDonnell Douglas* burden-shifting framework. *Levine v. DeJoy*, 64 F.4th 789, 797 (6th Cir. 2023).[1]

That framework "proceeds in three steps." *Smith*, 13 F.4th at 515. Barnett-Morgan must first establish a prima facie case of discrimination. *Id.* To do so, Barnett-Morgan must show that "(1) [she] is a member of a protected group; (2) [she] was subjected to an adverse employment decision; (3) [she] was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably." *Id.* (citation omitted). If she makes that threshold showing, the burden shifts to Inverness "to articulate a legitimate, nondiscriminatory reason for" the adverse employment action. *Id.* If Inverness does so, the burden then shifts back to Barnett-Morgan to show "that the reason the employer gave was not its true reason, but merely a pretext for discrimination." *Id.* (citation omitted).

As the grounds for her race-discrimination claim, Barnett-Morgan challenges her removal from the shift-lead role and her alleged subsequent termination. In granting summary judgment to Inverness, the district court provided alternative bases for its decision. *First*, the district court concluded that Barnett-Morgan's removal from service as a shift lead did not alter the terms or conditions of her employment and therefore was not an adverse employment action. The district court further determined that Barnett-Morgan failed to establish that she was replaced by someone outside of her protected class or treated differently than similarly situated employees. For those reasons, the district court concluded that Barnett-Morgan failed to establish a prima facie case of discrimination. *Second*, the district court concluded that, in any event, Inverness had provided a

---

[1] Though Barnett-Morgan critiques the *McDonnell Douglas* burden-shifting framework, she does not dispute that it continues to govern. Barnett-Morgan Br. 45-47. Regardless, for the reasons below, Barnett-Morgan would not prevail even if we followed her preferred approach and asked only whether she "present[ed] sufficient evidence to create a genuine dispute as to whether the employer's stated" non-race-based reasons for the challenged employment actions "w[ere] pretextual." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 323 (2025) (Thomas, J., concurring) (citations omitted).

legitimate, non-discriminatory rationale for terminating Barnett-Morgan. Because Barnett-Morgan failed to put forward evidence to demonstrate that Inverness's cited justification was pretextual, the district court held that her discrimination claim failed on that independent ground.

As discussed below, we may assume arguendo that Barnett-Morgan has established a prima facie case of employment discrimination. Barnett-Morgan's race-discrimination claim nonetheless fails because she has not provided evidence to establish that Inverness's cited, non-discriminatory rationales for its challenged employment decisions were pretextual.

1

The parties devote much of their appellate briefs to debating whether Barnett-Morgan made out a prima facie case—and in particular, whether her reassignment from the shift-lead role was an adverse employment action for purposes of Title VII. This issue implicates *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), which clarified the threshold for asserting discriminatory employment actions subject to Title VII review. Relevant here, *Muldrow* instructs that an adverse employment action is something that brings "about some disadvantageous change in an employment term or condition." *Id.* at 354 (citation omitted).

*Muldrow* does not neatly answer how to characterize Barnett-Morgan's reassignment from service as a shift lead. As the district court noted, Barnett-Morgan neither applied nor was interviewed for the shift-lead role; she received it because she volunteered for it. Nor did Barnett-Morgan's reassignment out of the shift-lead role alter her day-to-day job duties, disciplinary authority, formal title, pay, or benefits. Still, there is evidence that serving as a shift lead came with the power to set schedules, monitor co-employees' breaks, report behavioral concerns to management (which could trigger investigation), and require all employees to confer with the shift lead as the "first point of contact" prior to reporting issues with another employee or policy. Croft

Dep., R.39-4, PageID 456-57. Shifting such authority away from Barnett-Morgan and to someone else would arguably leave Barnett-Morgan "worse off respecting employment terms or conditions." *Muldrow*, 601 U.S. at 355.

Given the posture of this case, we need not resolve how *Muldrow* maps onto Barnett-Morgan's reassignment from shift lead. Even assuming that Barnett-Morgan suffered an adverse employment action, her race-discrimination claim fails for independent reasons. We therefore assume without deciding that Barnett-Morgan established a prima facie case with respect to her reassignment from shift lead and termination.

2

Having accepted that Barnett-Morgan established a prima facie case of racial discrimination, Inverness must "articulate a legitimate, nondiscriminatory reason for" the adverse employment actions. *Smith*, 13 F.4th at 515. If Inverness does so, the burden shifts back to Barnett-Morgan to put forth sufficient evidence to show that Inverness's cited reasons are a mere pretext "fabricated to conceal an illegal motive." *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir. 2009). We conclude that Inverness has offered legitimate, nondiscriminatory reasons for reassigning Barnett-Morgan from the shift-lead role and for her later alleged termination. We further conclude that Barnett-Morgan has failed to offer sufficient evidence to demonstrate that Inverness's cited justifications were pretextual. That failure forecloses her race-based discrimination claim.

*Shift-lead reassignment*. We begin by addressing the shift-lead reassignment. At the time of the reassignment, Inverness's then-installation manager, Kelley Jeans, explained that Croft was being selected as third-shift lead "[g]iven" her "wide breadth of experience across the [Transition

Assistance Program] and in all roles represented at the [call center]." Jeans Staffing-Changes Email, R.39-2, PageID 431.

The district court concluded that any race-discrimination claim arising from Barnett-Morgan's reassignment from the shift-lead role failed on threshold grounds. So it declined to specifically address Inverness's stated justification for selecting Croft. We may, however, affirm on any ground apparent in the record. *Patterson v. Kent State Univ.*, 155 F.4th 635, 644 (6th Cir. 2025). Inverness has urged—both in the summary judgment proceedings and on appeal—that Croft's superior experience and breadth of roles constitute legitimate, nondiscriminatory reasons for replacing Barnett-Morgan as shift lead. We agree. Such reasons, "if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (emphasis omitted) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)).

To prevail, then, Barnett-Morgan needed to come forward with evidence demonstrating that Inverness's cited reasons for selecting Croft were pretext for racial discrimination. To make that showing, Barnett-Morgan could have sought to demonstrate that Inverness's proffered reason "(1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain" Inverness's actions. *Levine*, 64 F.4th at 798 (citation omitted). So too, "an employer's shifting termination rationales" can serve as "evidence that the proffered rationale may not have been the true motivation for the employer's actions." *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890 (6th Cir. 2020). No matter Barnett-Morgan's chosen approach, she "must produce sufficient evidence from which a jury could reasonably reject [Inverness's] explanation of why it" replaced her as shift lead. *Chen*, 580 F.3d at 400. "Mere personal beliefs, conjecture and speculation" do

not suffice. *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) (cleaned up).

Barnett-Morgan has not presented any evidence that Inverness's explanation for replacing her as third-shift lead was pretext for discrimination. Indeed, she makes no argument on appeal that Inverness's decision to select Croft as the third-shift lead was motivated by anything other than Croft's resume. Nor did she identify evidence of pretext in the summary judgment proceedings.

At most, Barnett-Morgan takes issue with Inverness's characterization of Croft as more qualified. In her view, Croft was "highly inexperienced." Barnett-Morgan Br. 9. But Barnett-Morgan does not dispute that Croft had over eight years of experience working as a counselor in the Transition Assistance Program, including time spent as a transition counselor on the third shift. Nor does she dispute that Croft had prior managerial experience with Inverness as an interim installation manager at several stations overseas. Thus, whatever Barnett-Morgan's "personal beliefs, conjecture and speculation" about Croft's appointment, *Snyder v. Pierre's French Ice Cream Co.*, 589 F. App'x 767, 771 (6th Cir. 2014) (quoting *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 (6th Cir. 1986)), they "do not refute the undisputed evidence in the record that Croft worked on the Transition Assistance Program for a longer period of time and across a wider variety of roles than Barnett-Morgan," SJ Order, R.63, PageID 880 n.7. Barnett-Morgan has therefore failed to demonstrate that Inverness's explanation for its decision to substitute Croft as shift lead was pretextual.

*Termination*. Barnett-Morgan also asserts that Inverness terminated her employment based on her race. Barnett-Morgan's employment ended following her August 26, 2021, counseling session with Vega. While some events of that day (like whether Barnett-Morgan threw her access

card on the floor or accidentally dropped it) are disputed, others are not. Specifically, all parties agree that Barnett-Morgan (i) prematurely walked out of the counseling session after repeatedly saying "I'm done," (ii) refused to sign the counseling form, (iii) cursed at Trombley, a fellow employee, and (iv) left the call center without her access card. Barnett-Morgan Dep., R.32-5, PageID 262-64; Barnett-Morgan Affidavit, R.39-1, PageID 424-26. Based on those events, Vega informed HR that Barnett-Morgan had "quit" and that her last day was August 26, 2021. Vega Emails with HR, R.32-18, PageID 315. A few hours later, an HR manager cited these same events in response to Barnett-Morgan's email seeking clarification for the grounds of her termination.

Inverness asserts that Barnett-Morgan's behavior on August 26 provided it with a "legitimate, nondiscriminatory" basis for her termination. Inverness Br. 40-41. Barnett-Morgan does not dispute that such behavior would constitute a legitimate basis for terminating an employment relationship. Instead, she asserts on appeal that Inverness's justification was pretextual because Inverness has maintained that the end of Barnett-Morgan's employment followed her voluntary resignation rather than her termination. From there, Barnett-Morgan claims that Inverness's explanation is conflicting and thus indicative of pretext.

Barnett-Morgan's resignation-versus-termination response misses the point: Inverness has never wavered in its explanation of the underlying conduct that precipitated Barnett-Morgan's departure. In short, Inverness's "rationales" have not "shifted." *Miles*, 946 F.3d at 890. Its explanation has instead depended on the events of August 26, 2021. Those events, according to multiple witnesses, included Barnett-Morgan's unprofessional behavior, unwillingness to participate in counseling, use of disrespectful language towards another employee, and storming out of the office. The day's events reflected a legitimate, non-discriminatory rationale for Barnett-

Morgan's employment ceasing on August 26. That remains true no matter whether the employment action is framed as a resignation or termination.

In short, Barnett-Morgan "has not produced evidence from which a reasonable factfinder could doubt that she was fired" or replaced as shift lead for reasons other than race. *Chen*, 580 F.3d at 402; *see also* SJ Order, R.63, PageID 880-83. We thus affirm the district court's grant of summary judgment to Inverness on Barnett-Morgan's race-discrimination claim.

B

Barnett-Morgan also contends that Inverness retaliated against her because of her complaint that Schirrmacher was creating a hostile work environment. But Barnett-Morgan failed to exhaust administrative remedies with respect to that claim before the EEOC. We therefore affirm the district court's grant of summary judgment on that claim.

Title VII prohibits employers from retaliating against employees for engaging in Title VII protected activity. 42 U.S.C. § 2000e-3(a). But before an employee can bring a Title VII claim in federal court, she must exhaust her administrative remedies by filing "an administrative charge with the EEOC." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010); *see* 42 U.S.C. § 2000e-5(e)(1). "The charge must be 'sufficiently precise to identify the parties, and to describe generally the action or practices complained of.'" *Younis*, 610 F.3d at 361 (quoting 29 C.F.R. § 1601.12(b)). "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [her] EEOC charge." *Id.*

"Because employees often file EEOC charges pro se," we construe those charges "liberally in favor of the employee when evaluating exhaustion." *Milczak v. Gen. Motors, LLC*, 102 F.4th 772, 782 (6th Cir. 2024). Even so, the charge must at least "put the EEOC on notice" that the employee may have suffered the claim alleged, "such that the agency can investigate that claim if

it so chooses." *Id.* (citation omitted). Providing notice gives "the employer information concerning the conduct about which the employee complains," as well as affords "the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion" before a suit is filed. *Younis*, 610 F.3d at 361.

Barnett-Morgan failed to exhaust her administrative remedies for her retaliation claim. In her formal EEOC charge, Barnett-Morgan did not check the box for retaliation, made no mention of retaliation, and did not use "any language" that "would prompt the EEOC to investigate" an "uncharged" claim of retaliation. *Id.* at 362-63 (citation omitted). The charge instead focused exclusively on Barnett-Morgan's allegation that Inverness discriminated against her based on her race. *See* EEOC Charge, R.32-23, PageID 332 ("I believe I was discriminated against because of my race."). Even construed liberally, her charge was insufficient to "put the EEOC or the employer on notice" that Barnett-Morgan was separately alleging protected-activity retaliation by Inverness. *Younis*, 610 F.3d. at 363; *see also Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998).

Barnett-Morgan criticizes the district court for giving "no weight to" her "initial inquiry to the EEOC where she specifically selected retaliation as a basis for her complaint." Barnett-Morgan Br. 48. Likewise, she argues that the district court failed to "examine the effect" of an email Barnett-Morgan sent to the EEOC. *Id.* Neither document demonstrates that Barnett-Morgan exhausted her administrative remedies.

When considering whether a plaintiff exhausted her administrative remedies, the district court is required to consider only those communications that constitute a "charge" of discrimination. *Younis*, 610 F.3d at 361. To be sure, our Court has held that "a wide range of documents might be classified as charges." *Williams v. CSX Transp. Co., Inc.*, 643 F.3d 502, 509

(6th Cir. 2011) (citation omitted). Still, a document or communication sent to the EEOC must meet at least three requirements to qualify as a "charge that is necessary to exhaust an employee's administrative remedies." *Id.* (quotation marks omitted). First, it "must be verified—that is, submitted under oath or penalty of perjury"; second, it "must contain information that is sufficiently precise to identify the parties, and to describe generally the action or practices complained of"; and third, "an objective observer must believe that the filing taken as a whole suggests that the employee requests the agency to activate its machinery and remedial processes." *Id.* (cleaned up).

Barnett-Morgan's cited communications with EEOC do not satisfy those criteria. Barnett-Morgan notes that she submitted an EEOC inquiry via an online form. There is no evidence that the online form was verified; it does not precisely describe how Inverness allegedly retaliated against Barnett-Morgan; and Barnett-Morgan does not request any intervention or relief in the document. Inverness further claims that it never received the inquiry and became aware of Barnett-Morgan's allegations only months later when it received a formal notice of the EEOC charge; Barnett-Morgan has cited no contrary evidence in the record. As for the email Barnett-Morgan provided to the EEOC during its investigation, that correspondence was also not verified and it does not seek any particular action by the EEOC on the basis of a separate retaliation claim. The inquiry and email therefore implicate the concern that "allowing a Title VII action to encompass claims outside the reach of the EEOC charges would deprive the charged party of notice and would frustrate the EEOC's investigatory and conciliatory role." *Younis*, 610 F.3d at 362. Because neither the EEOC inquiry nor Barnett-Morgan's email to the EEOC constitutes a "charge," those communications are insufficient to satisfy Barnett-Morgan's obligation to exhaust her administrative remedies with respect to her retaliation claim. *See id.* at 361-62.

\*　　\*　　\*

We affirm the judgment of the district court.